Frank A. PELLICCIA, Statutory Receiver for Standard Electronics Corporation

v.

The UNITED STATES.

No. 36–74.

United States Court of Claims.

Nov. 19, 1975.

Scott G. Rigby, Washington, D. C., attorney of record, for plaintiff; King & King, Chartered, Washington, D. C., of counsel.

John W. Showalter, Washington, D. C., with whom was Ass't Atty. Gen. Rex E. Lee, for defendant.

Before DURFEE, Senior Judge, and NICHOLS and KASHIWA, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

### PER CURIAM:

This case comes before the court on plaintiff's * request, filed March 5, 1975, for review by the court of the recommended decision filed on February 19, 1975, by Trial Judge Fletcher, pursuant to Rules 166(e) and 54(b)(3) and on defendant's motion in response, filed April 4, 1975, to adopt said recommended decision. The case has been submitted to the court on the briefs of the parties and oral argument of counsel. Upon consideration thereof, since the court agrees with the said recommended decision, as hereinafter set forth, it hereby affirms and adopts the same as the basis for its judgment in this case.

█ Plaintiff argued before us that the trial judge's opinion ignored his contention that the delivery date at issue had been extended on October 22, 1969, by express bilateral oral agreement to an indefinite period to enable the contractor to perform additional tests. Plaintiff has failed to show the existence of any express agreement to extend the delivery date; at most, an agreement arose by implication only from agreements concerning future testing. However, plaintiff's subsequent conduct indicates that he did not rely on any alleged oral agreement made on October 22, 1969. Plaintiff's president signed an agreement on October 31, 1969, extending the delivery date to October 29, 1969. This agreement did not mention the alleged October 22, 1969, oral agreement and it is hardly possible that plaintiff would have signed the written agreement if an oral agreement extending the delivery date to an indefinite period already existed. On October 29, 1969, plaintiff wrote to the Procurement Contracting Officer (PCO) requesting an extension of the delivery date to November 18, 1969.

The request would have been unnecessary if the parties had agreed on October 22, 1969, to extend the delivery date indefinitely. Moreover, plaintiff's response to the PCO's show cause letter, dated November 11, 1969, did not include any reference to the alleged October 22, 1969, agreement. The above factors negate plaintiff's argument that it relied on an express oral agreement to extend the delivery date which should supersede the written agreement signed by plaintiff on October 31, 1969.

Therefore, it is concluded that plaintiff is not entitled to recover and the petition is dismissed. The termination for default having been properly issued, judgment is entered for defendant covering its excess costs of procurement in the stipulated amount of $13,400.

The opinion and conclusion of law of the trial judge follow:

FLETCHER, Trial Judge: In this contract case, plaintiff challenges, pursuant to Wunderlich Act standards, 41 U.S.C. §§ 321–322 (1970) the finality of an adverse decision by the Armed Services Board of Contract Appeals (ASBCA Nos. 14753 and 16299). As described by the Board:

ASBCA No. 14753 is an appeal from the contracting officer's final decision dated 18 November 1969 terminating the above contract for default on the ground that appellant failed to satisfy the contract requirements by the delivery date, as amended. Appellant contends that by its course of conduct the Government waived the delivery date on which the termination was based, and, further, that by the time of termination appellant had completed or substantially completed all of the contract requirements.

ASBCA No. 16299 is an appeal from the contracting officer's final decision dated 2 April 1971 determining that appellant is liable to the Government

---

* As is apparent from the caption, the nominal plaintiff in this case is Frank A. Pelliccia, who is a Statutory Receiver appointed by the Superior Court of New Jersey, Chancery Division, Monmouth County, Docket No. C–3284–70, for Standard Electronics Corporation. Herein the designation of "plaintiff" is given to the corporation which was the contractor involved in this dispute.

under the above contract for $15,-965.93 representing excess costs of reprocurement. Appellant does not challenge the excess cost assessment on grounds other than the alleged impropriety of the default termination. The quantum of excess costs assessed has become the subject of a stipulation discussed *infra*.[1]

From a careful consideration of the administrative record, it is concluded for reasons hereinafter stated that the Board's decision in ASBCA No. 14753 is supported by substantial evidence and is correct as a matter of law. Accordingly, plaintiff's motion for summary judgment is denied, and defendant's cross-motion is allowed. Plaintiff's petition is dismissed, and judgment entered for defendant on its counterclaim for $13,400.

Plaintiff, an experienced builder of television transmitters, was the successful bidder in responding to a solicitation for bids by the Sacramento Army Depot (SAAD) covering the fabrication and delivery of two television transmitters for broadcast over Channels 8 and 10, respectively. The Army intended to use the two transmitters in the Panama Canal Zone as part of the Armed Forces Radio and Television (AFRT) system, and in keeping with a policy of assuring local governments that AFRT stations would not interfere with local transmitting and receiving activities, the solicitation leading to award of the contract required bidders to furnish evidence of Federal Communications Commission (FCC) "type acceptance" of the bidder's proposed transmitter system. After some initial confusion over whether an existing type acceptance applied to plaintiff's particular equipment, the FCC advised the Army that plaintiff's transmitter had not been type accepted. Appar-

ently, however, the plaintiff did not anticipate any difficulty in obtaining FCC acceptance, and the contract, as awarded to plaintiff on June 25, 1969, was based on the mutual understanding that FCC type acceptance had to be obtained by plaintiff before the Government would accept the transmitters.

The contract required delivery of both transmitters within 60 days from the date of award and in its General Provisions incorporated by reference the clauses contained in Standard Form 32, including the standard Default Clause for fixed supply contracts. In addition, the contract included as Attachment 1 specifications prescribing electronic characteristics with allowable tolerances. The performance standards set forth in Attachment 1 (which were derived from an earlier industry association publication) were similar to those applicable to FCC type acceptance except in the area of picture quality where the Attachment 1 standards were somewhat more strict.

From the very beginning, plaintiff experienced performance difficulties attributable for the most part to delivery delays of needed parts and in securing adequate personnel. Following the expiration of the prescribed delivery date, the Administrative Contracting Officer (ACO) issued a so-called "show cause" letter [2] inviting plaintiff to present any excuses it might have for its failure to deliver. Plaintiff's response appears to have satisfied the Government, for instead of a threatened default termination, the Government agreed to a contract modification (A001) extending the delivery date to October 23, 1969, in return for a reduction in the contract price.

As originally awarded, the contract contained no "proof of performance" testing requirements for the transmitters

---

1. The nearly $16,000 of excess cost of reprocurement, as asserted by the contracting officer, was later reduced by stipulation of the parties during the Board hearing to the figure of $13,400. On the basis of such stipulation, the Board concluded that plaintiff was liable to the Government in the stipulated amount of $13,400 "plus interest thereon". Defendant

has counterclaimed for said stipulated amount and, since plaintiff has filed no reply to the counterclaim, it may properly be assumed that the stipulation as to quantum only remains viable in this proceeding.

2. About two weeks previously, the ACO had issued a ten-day "cure" notice.

although such testing is a normal FCC requirement in standard commercial sales. Upon learning of this omission, AFRT requested the procuring agency to obtain an amendment requiring system testing. Negotiations followed during which plaintiff's president indicated willingness to perform the desired testing with no change in the October 23 delivery date and would engage the services of a Washington, D.C. firm of consulting engineers for assistance in conducting the desired tests. The parties also agreed to an increase in the contract price, and Modification A002 amended the contract accordingly as of October 9, 1969. A form listing and identifying the performance tests to be conducted was incorporated into the contract as Attachment 2, which was similar to those previously used by the Government except for the addition of a specially-drafted page covering "envelope delay" measurements as specified in Attachment 1.

On October 10, Mr. Wilner, a member of the engineering firm retained by plaintiff, arrived at the plant, and meetings were held to discuss system test procedures and equipment. Except for station monitors needed to conduct FM noise tests, plaintiff possessed all necessary testing equipment, and testing procedures were commenced on October 13.

Mr. Wilner discovered that the testing requirements for FCC type acceptance were identical to the requirements of Attachments 1 and 2, except for two or three areas in Attachment 1. Accordingly, he informed all concerned that he would test initially to FCC performance parameters and thereafter seek to comply with the few more stringent requirements of Attachment 1 if time allowed. The Government representatives appeared to have no objection to Wilner's plan. However, plaintiff's president had assured them that final test data would show full compliance with the contract attachments, and the Board properly found that plaintiff recognized its contractual obligation to demonstrate compliance with all the performance require-

ments of Attachment 1. It was further found that, so long as the contract requirements were ultimately satisfied, the Government representatives had no particular concern as to isolated deficiencies which might be shown by test results at various times.

Despite delays incident to "debugging" and obtaining station monitor equipment, by October 21 the Channel 8 transmitter had been operated as an entire system in compliance with the requirements of Attachment 2; the same was true of the Channel 10 transmitter although those tests were not completed until November 7. However, certain of the performance requirements of Attachment 1 were never satisfied.

Meanwhile, the delivery schedule was further extended to October 29, 1969, by Contract Modification A003, formally signed by plaintiff's president on October 31. This extension had been verbally agreed to during prior negotiations and apparently came about by reason of a six-day delay incurred by the Government in obtaining funds for the system testing prescribed by Modification A002.

Plaintiff wrote the PCO on October 28 stating that its delays were primarily due to difficulties in obtaining proper test equipment, to breakdowns of test equipment, and to interference by the Government's Quality Assurance Representative (QAR) and an observer from the Canal Zone using agency. With regard to the alleged Government interference, however, plaintiff's own consulting engineer did not agree since he felt that the QAR had been exceptionally helpful in all of the testing. The Board accordingly could find no support for plaintiff's allegations of Government interference during testing.

On the extended delivery date, October 29, 1969, plaintiff wrote a letter to the PCO requesting a further extension of the completion date to November 18, 1969 "to enable us to complete the Contract Amendment # 1 Tests, and the packing of the equipment." On the same date, plaintiff advised the ACO by

letter that the remaining Attachment # 1 Tests would be done concurrently with FCC tests and continued to "satisfactory completion" within two weeks.

These October 29 letters from plaintiff crossed in the mails a "show cause" letter of the same date issued by the PCO in which plaintiff was invited to state within ten days any facts which might indicate that failure to perform arose out of causes beyond its control. The "show cause" letter included the standard paragraph stating that:

Any assistance rendered to you on this contract or acceptance by the Government of delinquent goods or services hereunder, will be solely for the purpose of mitigating damages, and is not to be construed as an intention on the part of the Government to condone any delinquency, or as a waiver of any rights the Government may have under subject contract.

Plaintiff received the "show cause" letter on November 3, 1969, and replied by letter to the PCO dated November 11, 1969. In that letter plaintiff reiterated that the delays were caused by test equipment problems and interference by Government personnel, and confirmed its request for an extension of the delivery date to November 18, 1969.

Meanwhile, testing had continued under Wilner's supervision. The expert assigned to advise the QAR, however, was recalled to Sacramento by the PCO, and a successor expert was appointed. The PCO notified plaintiff of this change by letter dated November 6, stating that the successor expert had been "designated for the life of the contract," that his authority was limited in the same way as his predecessor's, and, by follow-up telegram, that the substitution was not to be regarded as a waiver of any Government rights. The new expert arrived at plaintiff's plant on November 8, at which time the only Attachment 2 test remaining to be performed was the FM noise test on Channel 8.

On November 4, 1969, with almost all testing completed, Wilner returned to his Washington office to prepare the type acceptance report which plaintiff had not yet filed with FCC, and plaintiff advised both the PCO and the ACO that, except for the FM noise test, all tests on both transmitting systems had been "completed satisfactorily."

The advisor to QAR did not agree. He reported to the PCO on November 14 that certain performance requirements of Attachment 1 were not satisfied and that the equipment had not been tested as a system with all major components operated at the rated power input. Shortly prior thereto, several quality deficiency reports (QDR's) had been issued by the QAR relating to mechanical and visual discrepancies as distinguished from electrical operation or performance considerations, and these deficiencies were quickly corrected by plaintiff. Whereupon, plaintiff sent a telegram to the PCO stating that, despite the favorable reports of its consulting engineers, the QAR refused to sign the acceptance papers and that plaintiff was proceeding to comply with the revised packaging and shipping inspection requirements and would be "ready to deliver 18 Nov. 69." By another telegram to the PCO on November 17, plaintiff advised that the transmitters were packed and ready for shipment.

This was done despite the fact that neither the QAR or any other authorized representative had accepted the transmitters on behalf of the Government, or indeed had even authorized their transfer to the packaging company. The plaintiff's action was apparently based on its assumption that FCC type acceptance and SAAD approval of the proof of performance test results were imminent. Actually, however, the FCC type acceptance, application for which was not filed by plaintiff until November 10, was not forthcoming until several days after the default termination on November 18. SAAD never accepted the adequacy of the test results on the ground that neither transmitter met the Attachment 1 performance requirements with respect

to amplitude versus frequency characteristics, envelope delay versus frequency characteristics, and power consumption. As the Board found, on substantial evidence, plaintiff succeeded (albeit tardily) in satisfying the FCC type acceptance requirements but did not satisfy the stricter requirements contained in Attachment 1. Plaintiff's own consulting engineer agreed that this was true, but stated that by making relatively minor adjustments he could have satisfied the Attachment 1 criteria. He did not undertake to do so, however, because of his at that time single-minded concentration on satisfying the less stringent FCC type acceptance requirements. He adopted this approach because of his belief that the ACO was interested only in meeting the FCC specifications. Concerning the testing between November 3 and November 7, Mr. Wilner's report states:

It should be pointed out that as soon as we met the FCC requirements, we stopped because of the laborious, time consuming effort that it required. Undoubtedly, this could have been improved if we had more time. (By this time, the specter of not meeting the delivery date was so great that we just did not feel justified in trying to better the above results. [The ACO], also sensing this, told us to concentrate on meeting the FCC specs and not the Army's which was tighter in many areas.)

The Board was confronted with conflicting testimony on this factual issue of whether the ACO had waived full compliance with Attachment 1 requirements. In resolving the conflict, the Board found that the ACO did indeed concur in Wilner's efforts to expedite those tests necessary for FCC type acceptance whether or not they showed compliance with Attachment 1. But the Board went on to find:

In none of this [letters and telegrams exchanged between the parties during the period, October 29 to November 15] does there appear any mention of an understanding on appellant's part that it was not obligated to comply with Attachment 1 performance requirements to the extent they were more stringent than the comparable FCC type acceptance requirements. On a matter of this importance it is difficult to understand why appellant did not verify such an understanding in writing if it in fact existed. The correspondence generated by appellant indicates, on the contrary, that appellant recognized that completion of contract performance required compliance with the Attachment 1 requirements.

The PCO terminated plaintiff's contract for default by telegram dated November 18, 1969. The reasons for termination were explained in a final decision letter of the same date in which the PCO stated:

b. It was determined to terminate your contract for default for failure to effect timely delivery; failure to have FCC Type Acceptance, and failure to perform Systems test by 29 October 1969.

Thereafter, SAAD decided to reprocure the transmitters and to that end sent out bid solicitations containing the same terms and conditions as those in plaintiff's contract except for the addition of a written definition of the term "system test."

Meanwhile, plaintiff was endeavoring to upset the PCO's default termination and (1) offered to rerun the system tests provided the Government would bear an estimated cost for retesting of around $30,500, or, (2) to ship the transmitters to the Canal Zone, install them, and prepare for testing there. After preliminary negotiations which culminated in a meeting in the office of the Procurement Director for Army Material Command on July 23, 1970, both of plaintiff's proposals were rejected.

As might be expected, reasons for the default termination were also discussed at this meeting, particularly the contentions of Government representatives that plaintiff's "piecemeal" testing did not constitute a "system" test and that plaintiff, despite its full recognition of a

contractual obligation to demonstrate compliance with all Attachment 1 requirements, had failed to do so in several respects. While admitting such failure, plaintiff's consulting engineers testified before the Board to the effect that, until the meeting of July 23, they had been under the impression that the sole reason for termination was plaintiff's failure to meet the delivery date uncomplicated by any technical deficiencies. They considered the nonconformities to be insignificant and easily correctible in a relatively short time. The Board, however, on an extensive analysis of the expert testimony was unable to agree that the deficiencies were trivial or inconsequential and properly concluded that plaintiff's transmitters did not substantially conform to the Attachment 1 specifications. Nor, in the Board's view of the evidence, had the Government ever waived full compliance with those specifications.

Shortly after the meeting of July 23, the contracting officer was given authority to award a reprocurement contract and, as low bidder, RCA Corporation was awarded the contract on July 27, 1970. Following RCA's successful completion of the reprocurement contract, the contracting officer demanded from plaintiff nearly $16,000 as excess costs of reprocurement. The parties have stipulated, however, that if plaintiff is liable for such excess costs, the reasonable amount thereof is $13,400, and defendant has counterclaimed here for that amount. See footnote 1, *supra.*

From the foregoing, it is clear that plaintiff never substantially complied with all the contract requirements. It is also clear that the administration of the contract by defendant's representatives can hardly be described as adroit. For example, eight days after the issuance of a "show cause" letter, the PCO "designated for the life of the contract" a new expert to furnish technical assistance and guidance to the QAR. It is not unreasonable to interpret this action as evidencing the PCO's belief that the contract remained in full force and effect notwithstanding plaintiff's failure to deliver on October 29, 1969. From all the evidence before it, however, the Board was "unable to conclude that the Government manifested to appellant that time was not of the essence or otherwise induced appellant to continue performance in reliance upon the Government's failure to terminate."

Whether the Board's inability to conclude otherwise was justified requires reference to the guidelines developed by this court concerning waiver by the Government of its right to terminate a contract where the contractor has failed to meet the contract delivery date. See, for example, *DeVito v. United States,* 413 F.2d 1147, 188 Ct.Cl. 979 (1969) and the court's most recent decision in this area, *International Telephone & Telegraph Corp. v. United States,* 509 F.2d 541, 206 Ct.Cl. 37 (1975).

In the latter case, the court summarized the waiver after breach doctrine at 547–48, 206 Ct.Cl. at pp. 49–50, as follows:

> Under the *DeVito* rule, in a waiver after breach situation, time may again become essential and the Government may regain the right to terminate a delinquent contractor for default, if (1) the Government unilaterally issues a notice under the contract's Default clause establishing a reasonable but specific time for performance on pain of default termination, or (2) the parties bilaterally agree upon a new delivery date.

Insofar as applicable to the law of Government contracts, the doctrine thus succinctly summarized by the court appears to have been first articulated fully in Cuneo, *Waiver of the Due Date in Government Contracts,* 43 Va.L.Rev. 1 (1957). There, upon an extensive analysis of common law contract principles developed by early state court decisions in private contract litigation, the author concludes as follows at pp. 29–30:

> Whether an election [waiver] has taken place will be governed by the circumstances of each case. The an-

swer depends on whether the conduct of the Government agents reasonably indicates a manifestation of intention to permit continuation of performance. If such manifestation is given and the contractor acts accordingly, an election is made and time is no longer of the essence. Then, for the Government to require performance within a stated period, it must give notice to that effect. This period must be reasonable under circumstances existing at the time of giving the notice. If performance is not completed within this period, the Government has the right to terminate the contract for default.

■ A rational application of these principles to the facts presented here requires rejection of plaintiff's major contention that the Government by its actions waived the final established delivery date of October 29, 1969, so as to lose its right to terminate for default. While plaintiff's reliance on the *De Vito* decision as support for its contention is readily understandable, the case differs materially from the present one. The court's rejection of the default termination involved in *De Vito* was heavily influenced by the fact that at no time during the 48-day period between the contractor's failure to fulfill an installment delivery requirement and his receipt of the formal notice of termination, did he have any inkling that the contracting officer was thinking in terms of a termination for default. This total unawareness, coupled with the contractor's concerted and productive performance efforts during the same period—efforts made with the knowledge that the contracting officer was fully cognizant of them, was deemed sufficient to permit the contractor reasonably to infer that the Government had elected not to terminate on account of his failure to meet the first installment delivery requirement of the contract. 413 F.2d at 1153–54, 188 Ct.Cl. at 989, 991.

■ As revealed by the Board's detailed analysis of the contracting officer's actions and admonitions to plaintiff here and its account of the background circumstances attending those actions and expressions, the record in the instant case affords no rational basis for concluding that the plaintiff could have failed to recognize that a default termination was very much in contemplation. Plaintiff's expert was clearly disturbed by the probability of a default termination, and the PCO's "show cause" letter was issued immediately on plaintiff's failure to deliver on October 29. Equally remote from the situation that obtained in *De Vito* is the comparative insubstantiality of this contractor's performance efforts and the limited extent of his consequent tangible progress, as found by the Board, during the period between passage of the delivery date and the issuance of the default notice. Essentially, all that occurred during this period were plaintiff's efforts to obtain FCC approval and testing of the transmitters to show compliance with the contract specifications. While the FCC approval was eventually forthcoming, the tests regarding the more stringent contract requirements were never successful. Since the Board's factual determinations in this regard are supported by substantial evidence, they are conclusive here. Given those underlying determinations, it cannot be said that it erred in concluding that a waiver did not occur. Certainly that conclusion is not at odds with this court's holding in *De Vito*.

■ Nor is the *International Telephone & Telegraph* case any comfort to plaintiff. As shown by the above quotation from the opinion in that case, the court fully recognizes that time remains of the essence where both parties to the contract "bilaterally agree upon a new delivery date." The *unilateral* action of the Government there was insufficient to establish a new delivery date whereas here the *bilateral* supplemental agreement of the parties is evidenced by Modification A003 which sufficiently established October 29, 1969, as the new delivery date. Plaintiff's admitted failure to

**1044**

meet that new delivery date does not mean, as plaintiff would seem to imply, that upon such failure the contracting officer must instantly terminate the contract for default on pain of waiving the right to do so. Fairness to the contractor requires that the contracting officer allow a reasonable time within which the contractor may endeavor to demonstrate that its failure to deliver was excusable. Even when the delay is found not to be excusable, the contracting officer should have a reasonable time within which to determine whether a default termination would be in the best interest of the Government as the nondefaulting party. Obviously these considerations prompted the issuance by the PCO of the October 29 "show cause" letter inviting plaintiff to state within ten days any facts which might indicate that its failure to perform arose out of causes beyond its control and advising that:

> Any assistance rendered to you on this contract or acceptance by the Government of delinquent goods or services hereunder, will be solely for the purpose of mitigating damages, and is not to be construed as an intention on the part of the Government to condone any delinquency, or as a waiver of any rights the Government may have under subject contract.

In its summary description and analysis of the actions taken by the Government representatives at plaintiff's plant during the "show cause" period, the Board stated:

> Moreover, we are unable to conclude that the inspections and other actions taken by the QAR represented an inducement to continue performance. As found above these inspections were requested by appellant. Had the QAR refused to perform them the Government might have been charged with interference with appellant's efforts to complete performance. Although the QAR issued QDR's requiring corrective action the work involved was minor and did not relate to the performance testing, which was the major cause of

delay. Following appellant's correction of the deficiencies noted on the QDR's the QAR found the transmitters acceptable from a mechanical and visual standpoint, but he informed appellant at the same time (13–14 November 1969) that the transmitters could not be accepted until the FCC type acceptance was received and appellant's proof of performance test results were evaluated. As found above appellant did not file its type acceptance application until 10 November 1969 and did not mail its final proof of performance test reports until 17 November 1969. There is no evidence that appellant was advised that termination would be withheld pending action by the FCC or evaluation of appellant's proof of performance test results. Under these circumstances appellant could not reasonably have regarded the QAR's inspections and other actions in the post-delivery date period as an indication that the Government no longer considered it to be in default for failure to meet the delivery date.

From the foregoing, it is clear that the Board did not err in holding that the Government had the right on November 18, 1969, to terminate the contract for default on the ground that plaintiff had failed to meet the October 29 delivery date.

Finally, consideration must be given to plaintiff's contention that, even though it was fully aware of its failure to meet all the specifications required by Attachment 1 of the contract, nonetheless, the Government by failing to issue a formal Quality Deficiency Report waived full compliance with the specifications, or in any event, became estopped from claiming noncompliance therewith. According to plaintiff, the admitted nonconformities were relatively insignificant and could have been rectified by a few simple adjustments. In support of this contention, plaintiff relies on this court's decision in *Radiation Technology, Inc. v. United States,* 366

F.2d 1003, 177 Ct.Cl. 227 (1966) where it was held that a contractor is entitled to a reasonable period within which to cure a nonconformity provided the supplies shipped are in substantial conformity with the contract specifications.

■ The flaw in plaintiff's argument, of course, is its failure to accept the conclusiveness of the Board's finding that the admitted deviations, far from being trivial or inconsequential, were such as to justify a conclusory finding that plaintiff's transmitters did not substantially conform to the Attachment 1 specifications. It is true that the Board's record contains conflicting expert testimony in this regard but it is well established that in its review of an administrative record the court does not weigh the evidence independently. See, for example, *Phillips Construction Co., Inc. v. United States,* 179 Ct.Cl. 883 (1967) where it is observed at p. 890:

> It is true that the record contains evidence to the contrary from some of plaintiff's witnesses. But plaintiff goes much too far in asking, in effect, that this court make an independent evaluation of this conflicting evidence and reverse the Board on the ground that it should have believed one group of witnesses rather than another.

■ Plaintiff insists, however, that its expert was led by the ACO and QAR to believe that compliance with the FCC type acceptance requirements was the only performance criteria necessary to acceptance of the transmitters. Both Government witnesses denied that they had ever advised plaintiff's expert to forget about the Attachment 1 specifications which in several respects were more stringent than the FCC requirements. From all the evidence before it regarding the testing procedures, the most the Board could find was that the Government representatives had no objection to plaintiff's plan of proceeding whereby it would endeavor to meet the FCC requirements as the first order of business. The Board did not believe that from such concurrence the plaintiff could justifiably conclude that it had been relieved from its obligation to comply with Attachment 1 requirements as a significant part of its overall performance. There is substantial support in the record for the Board's conclusion.

Accordingly, there is no rational basis for finding either a waiver or an equitable estoppel, and the Government was entitled to insist on full compliance with the contract specifications. See, *H. L. C. & Associates Construction Co. v. United States,* 367 F.2d 586, 176 Ct.Cl. 285 (1966) and *Farwell Co. v. United States,* 148 F.Supp. 947, 137 Ct.Cl. 832 (1957).

## CONCLUSION

The plaintiff has failed to establish that the decision of the Armed Services Board of Contract Appeals was legally erroneous, arbitrary, capricious, or unsupported by substantial evidence. Accordingly, plaintiff's motion for summary judgment is denied, the defendant's cross-motion for summary judgment is allowed, and plaintiff's petition dismissed. The termination for default having been properly issued, judgment is entered for defendant covering its excess costs of procurement in the stipulated amount of $13,400.