ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeal of -- )
)
DayDanyon Corporation ) ASBCA No. 57681
)
Under Contract No. SPM8ED-09-D-0001 )

APPEARANCE FOR THE APPELLANT:        Mr. Joseph S. Jankowski
                                       President

APPEARANCES FOR THE GOVERNMENT:      Daniel K. Poling, Esq.
                                       DLA Chief Trial Attorney
                                     Joseph R. Weidenburner, Esq.
                                       Assistant Counsel
                                     Kristin K. Bray, Esq.
                                       Assistant Trial Attorney
                                       DLA Troop Support
                                       Philadelphia, PA

OPINION BY ADMINISTRATIVE JUDGE JAMES

This dispute arises from DayDanyon Corporation's (DayDanyon's) timely appeal from the DLA Troop Support contracting officer's (CO's) 20 April 2011 terminations for default of the captioned contract and its Delivery Order Nos. 0002 and 0003. The Board has jurisdiction of the appeal under the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 7101-7109. After a two-day hearing at the Board's offices, the parties filed briefs. The Board is to decide only the validity of the default termination.

FINDINGS OF FACT

1. On 23 April 2009, the Defense Supply Center Philadelphia (whose name was changed to DLA Troop Support (DLATS[1])) awarded indefinite-quantity type Contract No. SPM8ED-09-D-0001 (the contract) to DayDanyon for collapsible joint modular intermodal containers (JMICs). The contract was to be administered by the Defense Contract Management Agency (DCMA), Atlanta. (R4, tab 4 at 1)

2. The contract specified contract line item numbers (CLINs) for the JMICs: CLIN 0001, National Stock Number (NSN) 8145-01-564-5802, "COLOR GREEN"; CLIN 0002, NSN 8145-01-564-5795, "COLOR TAN"; CLIN 0003, NSN 8145-01-551-5311, "NOT PAINTED"; and CLIN 9906, first article testing. CLINs 0001-0003 each estimated 500 JMICs. (R4, tab 4 at 1-3, 12)

---

[1] For simplicity, hereafter we refer to the government purchasing activity as DLATS.

3. The contract provided for issuance of delivery or task orders and incorporated, *inter alia*, the FAR 52.209-4, FIRST ARTICLE APPROVAL— GOVERNMENT TESTING (SEP 1989); FAR 52.249-2, TERMINATION FOR CONVENIENCE OF THE GOVERNMENT (FIXED-PRICE) (MAY 2004); and FAR 52.249-8, DEFAULT (FIXED-PRICE SUPPLY AND SERVICE) (APR 1984) clauses (R4, tab 4 at 16, 21).

4. After a 4 June 2009 DLATS stop work order due to a bid protest, DayDanyon resumed contract performance on 2 July 2009 pursuant to bilateral contract Modification No. P00001 (R4, tab 11 at 1-2).

5. On 16 December 2009 DayDanyon submitted two first article JMICs for government testing (R4, tab 34 at 1). The government's 13 January 2010 test report found 27 major and 15 minor defects in the JMICs (R4, tab 38 at 1-8).

6. On 3 March 2010 DayDanyon again submitted two first article JMICs. The government's 30 March 2010 test report found 2 major and 5 minor defects in those JMICs. (R4, tab 43 at 1-9)

7. DLATS' 6 April 2010 letter to DayDanyon conditionally accepted the first article JMICs, provided that DayDanyon submit a corrective action plan addressing such deficiencies. On or about 7 April 2010 DayDanyon submitted such a plan, which DLATS approved on or about 9 April 2010. (R4, tabs 46, 47, 49) DLATS authorized DayDanyon to begin production of JMICs on 29 April 2010 (R4, tab 51).

8. On 3 May 2010 DLATS issued: (a) Delivery Order No. 0002 (DO 2) for 100 units of "NSN...8145015645795" (tan) and Delivery Order No. 0003 (DO 3) for 400 units of "NSN...8145015515311," (unpainted) both of which mistakenly cited CLIN 0001, whose NSN 8145-01-564-5802 was for "COLOR GREEN" (finding 2), and required delivery by 29 March 2010, and (b) unilateral Modification Nos. 000201 and 000301 to DOs 2 and 3, respectively, correcting their delivery date to 31 August 2010, but not correcting their CLIN 0001 cites (R4, tabs 53-56).

9. DayDanyon's 2 July 2010 email to DLA stated that DayDanyon expected contract modifications to add ECP No. 109028, to update 2 data lists and 12 drawings, and to correct "the incorrect Item/CLIN" stated in Modification Nos. 000201 and 000301 (R4, tab 63 at 3).

10. On 20 July 2010 unilateral Modification No. P00003 incorporated ECP No. 109028 and updated the data lists and drawings as DayDanyon expected (R4, tab 66).

11. On 5 August 2010 DO 2 unilateral Modification No. 000203 extended the delivery date for 100 tan JMICs to 15 October 2010, and DO 3 unilateral Modification

2

No. 000302 extended the delivery dates for 300 unpainted JMICs to 30 September 2010 and 100 unpainted JMICs to 15 October 2010 (R4, tabs 73-74).

12. Effective 23 November 2010, bilateral DO 3 Modification No. 000303 extended the delivery date for 400 unpainted JMICs to 8 March 2011 and bilateral DO 2 Modification No. 000204 extended the delivery date for 100 tan JMICs to 15 March 2011, cured the erroneous CLIN and NSN numbers and JMIC colors in DOs 2 and 3 and included the following release:

> IN CONSIDERATION OF THIS REVISED DELIVERY SCHEDULE, CONTRACTOR HEREBY UNCONDITIONALLY RELEASES AND WAIVES ALL CLAIMS AGAINST THE GOVERNMENT BY REASON OF DELAYS ATTRIBUTABLE TO EXCUSABLE CAUSES WHICH HAVE OR MAY HAVE OCCURRED IN THIS CONTRACT AND FOR ALL OTHER CAUSES, CONDITIONS AND HAPPENINGS WHICH HAVE OCCURRED UNDER THIS CONTRACT TO DATE.

(R4, tab 85 at 2, tab 86 at 2)

13. On 20 January 2011 DCMA industrial specialist Angelo Oppedisano sent CO Joseph McHenry a 20 January 2011 trip report on his 19 January 2011 visit at DayDanyon's plant. Mr. Oppedisano saw no completed JMICs, but he saw subassemblies, side panel frames, material for the base, miscellaneous hardware and other components needed for assembly that "appeared to be enough material to build a few hundred [JMICs] once they receive the sheet metal." (R4, tab 92 at 1-2)

14. On 9 February 2011 DCMA quality assurance representative (QAR) George Johnson and Mr. Oppedisano visited the DayDanyon plant (tr. 2/113-15), where Mr. Oppedisano photographed about 170 open frames; 80 H-configured frames; 100 rectangular plates; 3 larger rectangular plates; 8 packages of small parts; 2 hollow rectangular tubes; and 1 incompletely assembled JMIC. Mr. Oppedisano sent 10 photographs and told CO Joseph McHenry that some parts were missing, no production was being done and 5 people were there. (R4, tab 97 at 1-3, 5, 8, 11-12) Mr. Johnson said that the incompletely assembled JMIC was a "dummy" used for process control and quality measurements and "if we had to" DayDanyon could have assembled and shipped it (tr. 2/135-36). We find this report presented an unfavorable picture of appellant's production efforts.

15. After DLATS on 7 February 2011 asked DayDanyon to provide "digital pictures of finished units today," on 16 February 2001 DayDanyon sent photographs of several stacks of "materials and components" (R4, tab 95 at 1, tab 101 at 1-4).

16. On 17 February 2011 Mr. Oppedisano reported his visit to DayDanyon's facility to CO McHenry. He stated that all required parts to build 500 containers were not on site, nor was all hardware required to build that quantity, no completed units were available, there was no ongoing production, but Mr. Jankowski still thought he would be able to meet the March delivery dates. (R4, tab 102 at 1, 5)

17. The CO's 22 February 2011 cure notice stated that DayDanyon's contract performance was endangered by lack of progress, noted the impending DO 2 and DO 3 delivery dates, gave DayDanyon ten days to cure such conditions and stated that if those conditions were not so cured, the government might terminate the contract and DOs 2 and 3 for default (R4, tab 106 at 2-3).

18. In reply to DLATS' 1 March 2011 email asking DayDanyon, "How many units are completed as of today?" on 2 March 2011 DayDanyon told the CO: "I am e-mailing you a production update today, and a response to the show cause letter by Friday. We've got this thing nailed, we can begin shipments soon" (R4, tab 110), and later in the afternoon, "Currently, a major portion of the performance has been completed, and the remainder will be finished shortly" (R4, tab 111).

19. On 4 March 2011 DCMA approved DayDanyon's Shipping Instruction Request (SIR) that projected contract shipments no earlier than 30 March 2011, 14 April 2011, and 22 April 2011 (app. supp. R4, tab 16 at 1, 3, 6, 9), and DayDanyon's reply to CO McHenry's cure notice stated:

> The first three shipments of JMICs, comprised of 100–200 units per shipment, have been loaded into the DCMA SIR System. These will occur beginning later this month....
>
> ...Regarding the items noted in the Cure Notice, most are inaccurate. Each JMIC has 17 noted different assemblies or sub-assemblies, 53 parts, and dozens of additional pieces of hardware. Therefore, when a status report is based only on the number of completed JMICs it turns performance status into an inaccurate "all or none" extreme. Preparation and production of parts and assemblies have been ongoing. There have been 10 plus people working on this program since 01 January, and an additional 10 are being added currently.

(R4, tab 112 at 2)

4

20. DayDanyon's 7 March 2011 letter to CO McHenry offered $5,000 for "an extension of 14 days" and requested a new delivery schedule of "100+ units" on each of 31 March, 14 April, 22 April, 29 April and 6 May 2011 (R4, tab 113).

21. By 8 March 2011 DayDanyon did not deliver any of the 400 unpainted JMICs due under DO 3 (tr. 1/26, 154, 2/71).

22. On 11 March 2011 DayDanyon advised CO McHenry that it had ordered seven "custom designed...process stations for high production of JMICs" only two of which were needed to allow production of completed JMICs; they were to be installed the following week (R4, tab 114).

23. By 15 March 2011 DayDanyon delivered no JMICs to DLATS under DO 2 and DO 3; on the day before it began installing processing station 1 (R4, tab 116).

24. On 15 and 17 March 2011 DLATS issued requests for quotations for 75 tan JMICs and 160 unpainted JMICs (app. supp. R4, tabs 31, 32).

25. DayDanyon's 16 March 2011 email advised CO McHenry that components were arriving for processing station 2, and JMIC side and access panel sheets were being assembled to weldment frames (R4, tabs 117, 123-24).

26. On 17 March 2011 DayDanyon reported to CO McHenry the completed installation of processing station 1 (R4, tab 118 at 1), and on 18 March 2011 reported that processing station 1 drives were operational and being calibrated (R4, tab 119).

27. On 22 March 2011 DayDanyon advised CO McHenry that the "set-ups to begin running Stations One and Two began yesterday and are ongoing" (R4, tab 120).

28. DayDanyon's 28 March 2011 email to DCMA stated: "We have been continuing performance [on the contract] orders 0002 & 0003.... [W]e are looking to begin shipping as early as the week of 10 APR." DCMA's 28 March 2011 email to DayDanyon asked whether DLA had "indicated if they" would extend the contract performance period and advised of a new QAR, Mr. Robert Strain, for DayDanyon. (App. supp. R4, tab 10)

29. DayDanyon's 15 April 2011 email to CO McHenry stated: "Performance continues on SPM8ED-09-D-0001 Orders 0002 & 0003" (R4, tab 124 at 1).

30. On 20 April 2011, CO McHenry issued unilateral contract Modification No. P0004 which terminated the contract and DOs 2 and 3 for default for failure to deliver and included a decision that stated the basis for the default termination, the causes of DayDanyon's failures, his views on DayDanyon's excuses and advised DayDanyon of its appeal rights (R4, tab 125).

5

31. FAR 49.402-3(f) in effect on 23 April 2009 provided as follows:

> (f) The contracting officer shall consider the following factors in determining whether to terminate a contract for default:
>
> (1) The terms of the contract and applicable laws and regulations.
>
> (2) The specific failure of the contractor and the excuses for the failure.
>
> (3) The availability of the supplies or services from other sources.
>
> (4) The urgency of the need for the supplies…and the period of time required to obtain them from other sources, as compared with the time delivery could be obtained from the delinquent contractor.
>
> (5) The degree of essentiality of the contractor in the Government acquisition program and the effect of a termination for default upon the contractor's capability as a supplier under other contracts.
>
> (6) The effect of a termination for default on the ability of the contractor to liquidate guaranteed loans, progress payments, or advance payments.
>
> (7) Any other pertinent facts and circumstances.

In preparing his default termination decision, CO McHenry considered the FAR 49.402-3(f) factors regarding the contract terms and applicable regulations, whether DayDanyon was going to perform and produce, the high backorder situation, and use of emergency purchase orders to acquire JMICs within 120 days (R4, tab 125 at 3-5; tr. 1/182-84, 188-90).

32. On 11 July 2011 DayDanyon timely appealed to the Board from that CO's final decision, which was docketed as ASBCA No. 57681.

33. DayDanyon records state that: (a) on 1 April 2011 it ordered "2 Precision Straight Edges" from Mike Petsch & Associates, Inc. for $929.50, without evidence that it paid for such items, and (b) from 10 March to 23 April 2011 it paid approximately $32,000 to eight employees. Neither record shows that such amounts

6

were incurred for Contract No. SPM8ED-09-D-0001. (App. supp. R4, tab 35 at 42, tab 36 at 10-17)

34. During discovery, DayDanyon stated in response to government interrogatories that due to exceptional weather events on 15-16 December 2010, 25-26 December 2010 and 9-10 January 2011, "DayDanyon was closed and directly lost five days of production." We take judicial notice that DayDanyon's plant is located in Hart County, Georgia. The National Weather Service reports accompanying DayDanyon's response showed neither the historic normal weather nor any unusually severe weather for Hart County on such dates. DayDanyon's response also stated that–

> [D]elays in delivering of JMICS were partially caused by the inability of two suppliers/subcontractors to guarantee delivery dates of certain automated production set-ups by mid-January 2011 for early February 2011 delivery. This resulted in DayDanyon having to develop alternative methods and processes utilizing components it had available in-house or were readily available off the shelf, over the course of late January and through February 2011.
>
> ....
>
> These actions/inactions occurred [during] the latter part of December, 2010 until mid-January, 2011.

(App. supp. R4, tab 46 at 5-21, 23, 25)

## DECISION

### I.

The government has the burden to prove that its default termination was justified. *See Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 764-65 (Fed. Cir. 1987). A contractor's failure to make timely delivery of agreed-upon goods establishes a prima facie case of default. *Id.*

As last extended, the delivery dates were 8 March 2011 for the 400 DO 3 unpainted JMICs, and 15 March 2011 for the DO 2 100 tan JMICs (finding 12). By 8 March 2011 DayDanyon delivered no unpainted JMICs (finding 21) and by 15 March 2011 DayDanyon delivered no JMICs (finding 23). Nor were any JMICs of either type delivered on or before 20 April 2011 (finding 30). Therefore, the government has sustained its burden of proof that pursuant to the contract's

7

FAR 52.249-8 Default clause, ¶ (a)(1)(i), DayDanyon was in default for failure to deliver the JMICs by their agreed delivery dates.

## II.

The contractor has the burden to show that its failure to deliver the goods was excusable. *See DCX, Inc. v. Perry*, 79 F.3d 132, 134 (Fed. Cir. 1996), *cert. denied*, 519 U.S. 992 (1996). DayDanyon argues that DLATS was required to extend the delivery dates by five days due to "exceptional weather events" on 15-16 December 2010, 25-26 December 2010 and 9-10 January 2011 (app. br. at 51-52). The record contains evidence of neither the historic normal weather nor any usually severe weather for Hart County on such dates (finding 34). Thus, the record contains no proof of "unusually severe weather" under paragraph (c)(9) of the contract's FAR 52.249-8, Default clause. *See All-State Construction, Inc.*, ASBCA No. 50513 *et al.*, 04-2 BCA ¶ 32,778 at 162,082-84 (number of days of excusable weather delay determined by comparing experienced rain and snowfall to "historic normal" rain and snowfalls). Even if, *arguendo,* Hart County experienced "unusually severe weather" on those dates, that five-day delay would not excuse DayDanyon's failure to deliver timely.

DayDanyon argues that the CO abused his discretion by failing to consider the seven factors prescribed in FAR 49.402-3(f) before terminating the contract for default, to consider information Mr. Oppedisano and Mr. Johnson did not provide about DayDanyon's performance status and failed to prepare the written memorandum stating his reasons for terminating for default required by FAR 49.402-5 (app. br. at 57, 62).

FAR 49.402-3(f) prescribes as follows:

> (f) The [CO] shall consider the following factors in determining whether to terminate a contract for default:

> (1) The terms of the contract and applicable laws and regulations.

> (2) The specific failure of the contractor and the excuses for the failure.

> (3) The availability of the supplies or services from other sources.

> (4) The urgency of the need for the supplies...and the period of time required to obtain them from other sources, as compared with the time delivery could be obtained from the delinquent contractor.

8

(5) The degree of essentiality of the contractor in the Government acquisition program and the effect of a termination for default upon the contractor's capability as a supplier under other contracts.

(6) The effect of a termination for default on the ability of the contractor to liquidate guaranteed loans, progress payments, or advance payments.

(7) Any other pertinent facts and circumstances.

(Finding 31) In *DCX*, 79 F.3d at 135, the Court interpreted FAR 49.402-3(f) as follows:

[T]he factors in [§] 49.402-3(f) that [COs] are directed to consider before terminating contracts are not prerequisites to a valid termination. Although compliance or noncompliance with [§] 49.402-3(f) may aid a Board of Contract Appeals or a court in determining whether a [CO] has abused his discretion in terminating a contract for default, the regulation does not confer rights on a defaulting contractor. A [CO's] failure to consider one or more of the [§] 49.402-3(f) factors therefore does not require that a default termination be converted into a termination for the convenience of the government. [Citations omitted]

*See also American Renovation and Construction Co.*, ASBCA Nos. 53723, 54038, 09-2 BCA ¶ 34,199 at 169,061 (CO articulated a reasonable basis for the default termination in her show cause notice and final decision, which implicitly considered most of the factors in FAR 49.402-3(f)); *Recon Optical, Inc.*, ASBCA No. 56289, 09-1 BCA ¶ 34,110 at 168,671 (document accompanying default termination notice with no pen and ink signature of CO satisfied FAR 49.402-5).

In his decision included in his default termination notice, CO McHenry considered the FAR 49.402-3(f) factors regarding the contract terms and applicable regulations, the causes of DayDanyon's failures to deliver the JMICs by the last specified delivery dates and its alleged excuses, whether DayDanyon was going to perform and produce, the high JMIC backorder situation, and use of emergency purchase orders to acquire JMICs within 120 days (findings 30-31). He received Mr. Oppedisano's 20 January, 9 and 17 February 2011 reports of the status of parts and work activity at DayDanyon's facility and photographs of what Mr. Oppedisano saw and what DayDanyon photographed there (findings 13-16). He had reason to know of DLATS' mid-March 2011 solicitations for 75 tan and 160 unpainted JMICs (finding 24), indicative of the urgency of its JMIC requirements. The record evidence

9

shows an unfavorable view of DayDanyon's production efforts as of 9 February 2011 (finding 14). *See Novelty Products Co.*, ASBCA No. 21077, 78-1 BCA ¶ 12,989 at 63,346 ("There is no requirement that the [CO] must adopt the ACO's recommendations favorable to the contractor."). We hold that the decision signed by CO McHenry and included in Modification No. P0004 (finding 30) satisfied the FAR 49.402-5 requirement for a written memorandum of the reasons for the default termination, articulated a reasonable basis for his default termination and did not abuse his discretion in terminating the contract for default in accordance with the requirements in FAR 49.402-3(f) and 49.402-5.

III.

DayDanyon argues that the CO McHenry waived the 8 and 15 March 2011 JMIC delivery dates because the CO's lack of a response to DayDanyon (*see* finding 19) after 22 February 2011 and up to his 20 April 2011 default termination "meant an implied waiver of the delivery schedule" (app. br. at 64-65).

DayDanyon has the burden to prove its affirmative defense of waiver of the delivery schedule. *See Phoenix Petroleum Co.*, ASBCA No. 42763, 96-2 BCA ¶ 28,284 at 141,213. To prove such waiver, a contractor must show: (1) failure to terminate within a reasonable time after default under circumstances indicating forbearance; and (2) reliance by the contractor on the failure to terminate and continued performance by him under the contract, with the government's knowledge and implied or express consent. *DeVito v. United States*, 413 F.2d 1147, 1153-54 (Ct. Cl. 1969). Appellant must show, therefore, that it reasonably construed the CO's inaction from 8 March 2011 (the first delivery date) until 20 April 2011 (the termination date) as a waiver and it performed in detrimental reliance thereon. *See Tectron Corp.*, ASBCA No. 12901 *et al.*, 73-1 BCA ¶ 9786 at 45,718 (waiver requires proof of reasonable, detrimental reliance on government encouragement or inducement to continue performance).

In *Pelliccia v. United States*, 525 F.2d 1035, 1044 (Ct. Cl. 1975), the Court of Claims clarified the forbearance criterion of proof:

> Fairness to the contractor requires that the [CO] allow a
> reasonable time within which the contractor may endeavor
> to demonstrate that its failure to deliver was excusable.
> Even when the delay is found not to be excusable, the
> [CO] should have a reasonable time within which to
> determine whether a default termination would be in the
> best interest of the Government....

10

In applying the *DeVito* and *Pelliccia* waiver and forbearance guidelines, the ASBCA has distinguished "affirmative" and "non-affirmative" government actions to determine whether the government encouraged or induced continued performance. As stated in *Tectron*, 73-1 BCA ¶ 9786 at 45,719:

> After failure of [timely] delivery without excusable cause, the Government must make an election of remedies; i.e., to terminate the contract for default or to waive the delivery date and require continued performance. The time within which this election is made must be reasonable and often it is difficult to determine whether the Government is forbearing a termination for default to assess the situation or…is forbearing to continue the contract. The determination usually rests on whether the Government's acts are non-affirmative in nature, indicating forbearance of termination, or affirmative, indicating an election and waiver of the delivery date. Non-affirmative acts by the Government such as investigations do not operate as a waiver of the delivery schedule. On the other hand, affirmative acts directing or encouraging the contractor to continue performance operate as an election by the Government waiving the delivery date.

Several Board decisions exemplify non-affirmative government conduct in the interval between a contractor's default and the default termination notice (i.e., the forbearance period), that did not constitute a waiver: *Precision Dynamics, Inc.*, ASBCA No. 42955, 97-1 BCA ¶ 28,846 at 143,893-94 (QAR observation of contractor testing, silence and inaction); *Precision Standard, Inc.*, ASBCA Nos. 41375, 44357, 96-2 BCA ¶ 28,461 at 142,154, *aff'd*, 135 F.3d 775 (Fed. Cir. 1997) (table) (routine QAR plant visits and telephone calls to monitor contractor actions during the forbearance period); *Engineering Design & Development*, ASBCA No. 22067, 77-2 BCA ¶ 12,774 at 62,080-81 (government inaction, though government representatives may have known of continued performance); *Raytheon Service Co., A Subsidiary of Raytheon Co.*, ASBCA No. 14746, 70-2 BCA ¶ 8390 at 39,018 (government silence and inaction); *H.N. Bailey & Associates*, ASBCA No. 21300, 77-2 BCA ¶ 12,681 at 61,534 (government non-communication with contractor); *Bermite Division of Whittaker Corp.*, ASBCA Nos. 19211, 20474, 77-2 BCA ¶ 12,675 at 61,515-17 (government conferred with contractor on the cause of its noncompliant signals); *Tectron*, 73-1 BCA ¶ 9786 at 45,717-18 (government observed contractor performing contract after delivery date passed); *Precision Products, Inc.*, ASBCA No. 14284, 70-2 BCA ¶ 8447 at 39,299 (after the delivery date for 101 assemblies the government inspected and rejected 42 assemblies; and after the delivery date for 158 additional assemblies the government inspected and rejected 80 units; held: the government "merely elected to wait and see if appellant would in fact make deliveries").

11

Affirmative government conduct that waived a contractor's default includes acceptance of 420 units, out of 1,000 units due for delivery by 29 November 1960, from 30 November to 30 December 1960, apparently without issuance of a show cause disclaimer of waiver. *See DeVito*, 413 F.2d at 1150, 1153. Similarly, when the CO's partial default termination notice ordered the contractor to deliver 25 delinquent radios, he waived their delinquency. *Raytheon Service*, 70-2 BCA ¶ 8390 at 39,016.

With respect to *DeVito* waiver criterion (2), to constitute "detrimental reliance," activities performed by the contractor after the delivery date must amount to productive performance or tangible progress on the contract. For example, in a contract for bottled water, neither conducting a site survey, nor being responsible for liquidated damages to a subcontractor, nor attempting to purchase water from another source constituted productive performance or tangible progress. *See American AquaSource, Inc.*, ASBCA Nos. 56677, 57275, 13 BCA ¶ 35,212 at 172,788. Likewise, receipt of anodized aluminum parts without additional work performed does not constitute detrimental reliance. *Precision Standard,* 96-2 BCA ¶ 28,461 at 142,155.

DayDanyon had received many but not all JMIC parts and components by 17 February 2011 (finding 16). Between the 8 March and 15 March 2011 dates for delivering the DO 3 and DO 2 JMICs to the 20 April 2011 default termination, DayDanyon began assembling JMIC side and access panel sheets (finding 25); ordered, received components and installed two "process stations" to produce JMICs (findings 22-23, 25-27); and forecasted shipping "as early as the week of 10[-16] APR" (finding 28). However, by 20 April 2011, DayDanyon's JMIC deliveries remained delinquent (finding 30). Based on the foregoing facts, DayDanyon's performance from 8 March to 20 April 2011 was comparatively insubstantial and its tangible progress was limited. Thus, DayDanyon has not established detrimental reliance during such period. *See Pelliccia*, 525 F.2d at 1043.

Finally, a contractor must show that it incurred costs in continuing productive performance or tangible progress on the contract. *See Bermite Division*, 77-2 BCA ¶ 12,675 at 61,577 (default upheld because, *inter alia*, contractor failed to prove it incurred performance costs in reliance on government encouragement to proceed); *Precision Standard*, 96-2 BCA ¶ 28,461 at 142,151, 142,155 ($1,183.70 was "too small a sum to constitute detrimental reliance" in a $43,000 contract).

DayDanyon introduced records stating that from about 8 March to 20 April 2011 it paid eight employees $31,976 and ordered straight edges priced at $929.50, but no proof that it had paid such price. DayDanyon's evidence did not show that those amounts were incurred to perform Contract No. SPM8ED-09-D-0001. (Finding 33) Therefore, DayDanyon failed to prove it incurred approximately $32,000 from about 8 March to 20 April 2011 to perform Contract No. SPM8ED-09-D-0001, and such

12

amount was too small to constitute detrimental reliance. *See Bermite Division*, 77-2 BCA ¶ 12,675 at 61,577; *Precision Standard*, 96-2 BCA ¶ 28,461 at 142,155.

For the foregoing reasons, we hold that DayDanyon did not carry its burden of proving the affirmative defense of waiver. We deny the appeal.

Dated: 17 August 2015

DAVID W. JAMES, JR.
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 57681, Appeal of DayDanyon Corporation, rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals