ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeal of --                          )
                                      )
Delfasco LLC                          )        ASBCA No. 59153
                                      )
Under Contract No. W52P1J-12-C-0034   )

APPEARANCES FOR THE APPELLANT:         David S. Cohen, Esq.
                                       John J. O'Brien, Esq.
                                         Cohen Mohr LLP
                                         Washington, DC


APPEARANCES FOR THE GOVERNMENT:        Raymond M. Saunders, Esq.
                                         Army Chief Trial Attorney
                                       MAJ Elinor J. Kim, JA
                                       Robert B. Neill, Esq.
                                         Trial Attorneys


OPINION BY ADMINISTRATIVE JUDGE PROUTY

In this appeal we review the decision of the contracting officer (CO) to terminate the above-captioned contract with appellant, Delfasco LLC (Delfasco), for default. Because we find that Delfasco's unexcused failure to provide the munition suspension lugs required by the contract on schedule provided an adequate basis for the CO's decision, that there was no abuse of discretion by the CO, and that the government did not waive its right to timely delivery, we deny the appeal.

FINDINGS OF FACT

On 14 March 2012, the United States Army (Army) awarded Contract No. W52P1J-12-C-0034 (the contract) to Delfasco (R4, tab 1 at 1). The contract was for the manufacture and delivery of two different types of munition suspension lugs,[1] the MK3 and the somewhat smaller MS3314 (R4, tab 1 at 2, tab 3 at 1; tr. 1/40-41; app. br. at 1). The contract incorporated by reference the applicable standard

---

[1] To simplify a bit for the uninitiated, a munition suspension lug may be thought of as a handle for attaching a bomb or other munition to an aircraft. The bomb has a hole or holes at the top of its body into which the suspension lug or lugs may be threaded like a common screw or bolt. At the top of the lug (or screw) is a "bail," which is a closed loop that serves as the handle that the aircraft bomb release mechanism uses to hold on to the bomb until the pilot releases it. (*See* gov't br. at 6 (photographs))

termination for default clause contained in the Federal Acquisition Regulation (FAR) 52.249-8, DEFAULT (FIXED-PRICE SUPPLY AND SERVICE) (APR 1984) (R4, tab 1 at 53).

## I.    The Contractual Delivery Schedule

The contract required monthly deliveries of the MK3 and MS3314 lugs during the eleven-month period of 14 March 2013 through 14 February 2014 (R4, tab 1 at 4-12 (MK3 lugs), at 13-24 (MS3314 lugs)). The total number of MK3s to be produced was 6,700, while Delfasco was also expected to provide 20,000 MS3314 lugs during this time (R4, tab 1 at 2). On 24 July 2012, before delivery began, the Army issued bilateral Modification No. P00001 to the contract, approximately doubling the quantities required by the contract by exercising a partial option for an additional 5,947 MK3 lugs and for 23,034 MS3314 lugs (R4, tab 4 at 2). The delivery of the additional lugs required by this modification was to begin on 14 February 2014 (the same day the original contract ended) and continue until 14 November 2014 for the MK3 lugs and 14 March 2015 for the MS3314 lugs (*id.* at 3-13).

Modification No. P00002, issued on 6 February 2013, left the delivery schedule of the MK3 lugs unchanged, but altered the delivery schedule for the MS3314 lugs obtained after 14 March 2013 and provided for the delivery of additional MS3314 lugs (R4, tab 18). This modification also retroactively permitted first article test (FAT) reports (about which more will be discussed later) to be supplied by Delfasco on 31 January 2013, rather than their original deadline of 14 November 2012 (R4, tab 18 at 3). The reason for the extension of time to provide the FAT reports (done at Delfasco's request) was because Delfasco's original lug forging supplier ("lug forgings" are discussed below) declined Delfasco's purchase order, causing it to change to a company named Trinity Forge (R4, tabs 5-6, 9). Bilateral Modification Nos. P00003 (R4, tab 20) and P00005 (R4, tab 38) changed the delivery dates further, which we need not explore in detail yet, except to note that, after the issuance of P00005, batches of MK3 lugs originally due on or after 14 July 2013 were now due on 14 October 2013 and thereafter (*id.* at 3-4), and the first batches of additional MS3314 lugs were due on 14 September 2013 and thereafter (*id.* at 17-18).

## II.    The Manufacturing and Inspection Process for the Lugs

The journey from hunk of metal to usable bomb lug is not especially complicated, though it takes several steps. The raw material that made up the lugs was obtained by Trinity and turned into "lug forgings," which were unfinished pieces of metal of the dimensions of the completed bomb lug (R4, tab 3 at 6). After the forgings were completed, but before they were shipped to Delfasco, they were subject to inspection by a quality assurance representative (QAR) from the Defense Contract Management Agency (DCMA) (tr. 1/25). The QAR performed the inspection, which consisted of manually checking the dimensions of a sample of lug forgings and

2

validating the magnetic particle inspections[2] of the forgings that had already been performed by Trinity at the Trinity premises (tr. 2/83, 87-92).

Subsequent to the DCMA inspection, the lug forgings were shipped to Delfasco for further testing by Delfasco (including the destructive testing of a sample of the forgings) and the machining of the lugs (i.e., cutting the screw grooves into the metal) (tr. 1/41). The machined lugs were then delivered to a subcontractor for plating (tr. 1/43), from which they were sent to another subcontractor to perform another magnetic particle inspection (tr. 1/43-44). After that inspection, they were returned to Delfasco for final inspection, application of markings, packaging and delivery (tr. 1/14, 45; R4, tab 3 at 21).

### III. Delivery of Lugs under the Contract

The first lugs were delivered to the Army on 28 March 2013 (R4, tab 202). There were additional deliveries through 20 June 2013, summing to 2,489 of the MK3 lugs and 10,367 of the MS3314 lugs (R4, tabs 202-08). No further deliveries were ever accomplished under the contract (tr. 1/134-35).

### IV. Delfasco Fails to Make Timely Deliveries after June 2013, and the Parties Agree to Modify the Schedule

By mid-July 2013, Delfasco was falling behind its contractual schedule. Modification No. P00002 required the delivery of 3,000 MK3 lugs by 14 July 2013 (R4, tab 18 at 4-9), but it had only delivered 2,489, as noted above. Modification No. P00002 also required the delivery of 13,566 MS3314 lugs by 14 June 2013 (id. at 18-26), but Delfasco had only delivered 10,367 by that time, as also noted above. An additional 4,500 MS3314 lugs were due for delivery by 14 July 2013 (id. at 20-29).

Earlier, on 7 June 2013, the DCMA QAR was told by personnel at Delfasco's forgings supplier, Trinity, that the company would cease providing the forgings to Delfasco until Delfasco made further payment to it (R4, tab 115). On the same day, the contracting specialist handling regular communication with Delfasco for the government, Ms. Nancy Oakes (see tr. 1/50), asked Delfasco's principal, Mr. Goldenberg, in an email, to submit a letter to extend the contract "[s]ince Delfasco is delinquent on shipments" (R4, tab 22 at 1-2). Mr. Goldenberg responded that he would submit such a letter by the close of business the next working day (10 June), but did not, in fact, submit such a request (id. at 1). On 25 June 2013 Ms. Oakes reminded Mr. Goldenberg

---

[2] Magnetic particle inspection is a method of checking for flaws or cracks in a piece of metal that might otherwise be invisible to the naked eye (tr. 1/44).

that Delfasco was "delinquent" on the MS3314 lugs and asked him to submit the earlier-referenced letter by 28 June 2013 (*id.*).

Delays in obtaining this request from Mr. Goldenberg continued. On Friday, 28 June 2013, Mr. Goldenberg sent Ms. Oakes an email stating that the employee who was handling it had suffered a death in the family and that he would make sure she got the request by Monday (1 July 2013) (R4, tab 23 at 1). On Tuesday, 2 July 2013, Ms. Oakes again requested the letter from Mr. Goldenberg (R4, tab 24 at 1). Mr. Goldenberg responded by sending an employee an email requesting that it be accomplished "before the Holiday" (R4, tab 25 at 1). On 8 July, Mr. Goldenberg sent an email to Ms. Oakes that the extension request would be sent that day (R4, tab 26 at 1). Consistent with Delfasco's past practice, it was not. The Rule 4 file includes no documents reflecting such a request, and later correspondence from the government to Delfasco noted that the government had not received such a request (R4, tab 30 at 1).

The government continued to make efforts to get Delfasco on track to resume deliveries of the lugs. In an email sent on 18 July 2013 regarding a teleconference held earlier in the day about the delivery of the lugs, the government noted that Mr. Goldenberg promised that new forgings from Trinity "would be coming within a few weeks" and that Delfasco possessed some completed lugs that would be shipped the next week (R4, tab 27 at 1). This was noted to be contrary to information that Delfasco employee, Griffith Watkins, had given to a different government employee the same day, when he stated that Trinity was awaiting payment from Delfasco before shipping any lugs to the company (*id.*). The same information (that Trinity was awaiting payment from Delfasco prior to shipping the lugs) was confirmed by the DCMA QAR who worked with Trinity (R4, tab 28 at 1). On 22 July 2013, Ms. Wuorinen (a government employee involved in the contract, *see* tr. 1/53-54) informed other members of the government team that the DCMA QAR at Trinity had confirmed that Delfasco, in fact, had no lugs in-house and that it would be three weeks before any shipment to the government once they received the forgings from Trinity (R4, tab 29 at 1).

By letter to Delfasco dated 22 July 2013, Ms. Kathy Warner, the procuring contracting officer (PCO), noted that Delfasco had never submitted a new proposed schedule, despite the government's numerous requests beginning on 23 May 2013, and she proposed a new delivery schedule (R4, tab 30). The proposed new schedule required the first delivery of MS3314 lugs on 14 September 2013 (*id.* at 2). The letter offered Delfasco ten days to propose a different schedule for the government's consideration if it so wished, but stated that the government would unilaterally impose the new schedule if Delfasco failed to propose a new schedule (*id.* at 3).

4

The record shows no immediate response from Delfasco, and on the next day, 23 July 2013, DCMA sent a "Corrective Action Request" (CAR) to Delfasco requiring a response explaining its failure to comply with the contract's requirement for deliveries on 14 June 2013 and 14 July 2013 (R4, tab 32). The record does not include any response to this CAR from Delfasco. Nevertheless, on 31 July 2013, Mr. Goldenberg sent an email to Ms. Oakes regarding the schedule proposed in the 22 July letter, stating "We are ok with this schedule" (R4, tab 31).

On 5 August 2013 and 6 August 2013, the CO and Mr. Goldenberg, respectively, executed Modification No. P00005 effecting the extension of the schedule (R4, tab 38). Under the P00005 schedule, 2,850[3] MS3314 lugs were due on or before 14 September 2013, with more lugs due on 14 October 2013 (R4, tab 38 at 3, 4, 17-18).

*V.    Delfasco and the Army Discuss the Need for New First Article Tests*

On 3 September 2013, Ms. Oakes sent an email to Mr. Goldenberg noting that Trinity may have been out of production for the forgings for more than 90 days (R4, tab 36 at 1-2). According to Ms. Oakes, under the provisions of the FAT clause, Delfasco was required to inform the government if this were so, so that the CO could decide whether to require a new FAT or to waive that requirement (*id.* at 2). Mr. Goldenberg forwarded the email to Mr. Watkins, who confirmed with Ms. Oakes that the government was requesting information from which it might decide to require a new FAT (*id.* at 1). In an email sent to Ms. Oakes the next day, Mr. Watkins appeared to question whether the FAT clause truly applied to the circumstances present, where it was the subcontractor that was out of production for 90 days, not the prime contractor (R4, tab 39 at 1). There is no evidence that the dispute over the potential need for a new FAT was resolved at this time.

A week later, on 11 September 2013, Mr. Goldenberg emailed Ms. Oakes informing her that Delfasco was attempting to get new parts delivered to it from Trinity and needed to have them inspected by the DCMA QAR at Trinity (R4, tab 40 at 1). Ms. Oakes responded the same day to Mr. Goldenberg and again noted that, if Trinity had been out of production for more than 90 days, Delfasco needed to alert the government of the fact, in accordance with the FAT clause, and make a request to waive the requirement for the new FAT if, indeed, it wished to do so (R4, tab 41 at 1). In response, Mr. Goldenberg forwarded an email written by Mr. Watkins, opining that there was no need for a new FAT on the MK3 lugs, but

---

[3] It is not clear from the record why, but the number of MS3314 lugs required to be delivered on 14 September 2013 by P00005 was a larger number than the 2,082 required in the government's 22 July 2013 proposal (R4, tab 30 at 2). This difference does not turn out to be material to this appeal.

conceding that notification was appropriate for the MS3314[4] lugs (R4, tab 42 at 1). Again, the record includes no indication that this conversation was ever resolved, Mr. Goldenberg testified that there was no clear resolution of it (tr. 2/57-59), and Ms. Warner denies any recollection of personally directing Delfasco to conduct a FAT (tr. 1/116).

The FAT issue arose internally at Delfasco after it failed to deliver the lugs due on 14 September 2013. On 9 October 2013, Mr. Watkins sent an email to others within Delfasco noting that Delfasco owed the government notification that a FAT could be required under the contract and that they needed to consider the basis for requesting a waiver (R4, tab 219). In another internal email, dated 21 October 2013, Mr. Watkins again noted that the government had not been officially notified by Delfasco that a FAT might be required and that the government had not yet ordered a FAT, which might be waived if Delfasco could provide a reason for it (R4, tab 222).

*VI.    Delfasco Fails to Meet the Requirements of the Modified Schedule*

Delfasco failed to deliver the MS3314 lugs that were due on 14 September 2013[5] (R4, tab 43 at 1) and, in fact, they were never shipped to the government (tr. 1/110). On 20 September 2013, Ms. Warner sent Mr. Goldenberg a letter ("the show cause letter"), via certified mail and separate email, informing Delfasco that the government was considering terminating the contract for default and allowing it ten days to present evidence demonstrating that the failure to make a timely delivery was not its fault or otherwise due to factors outside of its control (R4, tab 43 at 1-2). The portion of the show cause letter explaining the grounds for potential termination read:

> Your company failed to deliver 2,082 MS3314 Lugs, CLIN 0003AQ that were scheduled to deliver September 14, 2013. Since you have failed to perform [the contract] within the time required by its terms, the Government is considering terminating the contract under the provisions for default of this contract.

(R4, tab 43 at 1)

---

[4] The email actually referred to M**K**3314 lugs (emphasis added), but we view that as a simple typographical error.

[5] The government show cause letter referenced 2,082 MS3314 lugs being required, consistent with the government's 22 July 2013 correspondence with Delfasco, but less than the number contained in the later-executed contract modification. As noted earlier, this discrepancy is not material to the dispute here.

6

## VII. The Army Terminates the Contract

The 20 September 2013 letter from the government apparently got Delfasco's attention. It responded on 25 September 2013 with a two-page letter from Mr. Goldenberg that included two additional pages of email correspondence between Delfasco and Ms. Kathy Fairbanks, a Trinity employee (R4, tab 45). The gist of the letter was that the delay was all Trinity's fault (*id.* at 1) ("root cause" was Trinity's "inability" to produce the forgings). According to the Delfasco letter, by 3 September 2013, Trinity was ready to ship 1,500 MS3314 lugs, with another 1,500 to follow on the 5th or 6th of September (*id.*). This, according to Mr. Goldenberg, would have given Delfasco ample time to provide the lugs by the 14 September delivery date (*id.* at 1).[6] According to the letter, the forgings were not shipped from Trinity to Delfasco as of the 25 September date of the letter because of quality control problems relating to the size of the bail on the lug forging that Trinity had been unable to fully resolve (*id.*). These quality control problems allegedly prevented the forgings from being ready for inspection by DCMA prior to 9 September and, in a comedy of errors, the DCMA QAR was only able to inspect the forgings on 20 September, at which point the quality control problem "appeared again" (*id.* at 1-2, 4).[7]

When Ms. Warner received this document from Delfasco, she investigated its allegations by contacting both the DCMA QAR, Mr. Trent Telenko, and Ms. Fairbanks, the Trinity employee included in the emails provided by Delfasco (tr. 1/117-18; R4, tab 48 at 2). Mr. Telenko emailed Ms. Warner, on 30 September 2013, and explained that the problems at Trinity (involving both the delays in getting the inspections scheduled and the problems that caused the parts to fail the inspection) came from Trinity being short-staffed and having had changes in key personnel (R4, tab 48 at 1). Mr. Telenko also explained that part of the quality problem came because of the stoppage of work, mid-task, due to lack of payment by Delfasco (*id.*). When Ms. Warner spoke with Ms. Fairbanks on 30 September 2013 she was informed that Trinity had only been partially paid by Delfasco for the 3,000 lugs, which was holding up the delivery of the lugs to Delfasco (tr. 1/82-83, 105).

---

[6] We are not so sanguine: as discussed above, there are numerous steps between the time that Delfasco receives the forgings and the time that they are ready for acceptance. Mr. Watkins testified that he believed it would take 10 to 14 days from the time that the lugs were received by Delfasco from Trinity before they could be shipped to the government (tr. 1/30-31). Even if 10 days – the low end of the estimate – were sufficient, the shipping from Trinity to Delfasco would leave zero margin for an on-time delivery to the government.

[7] According to an email from Mr. Ritchey, the administrative contracting officer, to Ms. Warner on 9 October 2013, the lug forgings at Trinity were finally found compliant by the QAR on the afternoon of 8 October 2013 (R4, tab 53).

On 7 October 2013, Mr. Goldenberg telephoned Ms. Warner to "give an update" on the lugs still at Trinity (R4, tab 53 at 1).[8] According to Ms. Warner's email to other DCMA personnel sent two days later, she informed him that she "was not at liberty to discuss the contract, but [she] did remind him that IF he chose to proceed, there was still the matter of the FA[T]" (id.). Mr. Goldenberg testified that Ms. Warner accurately reported the conversation, but noted that she had not given him any indication that she was planning on terminating the contract (tr. 2/12). Ms. Warner further reported in her email that Trinity subsequently left her a voicemail stating that the lugs had been inspected by the DCMA QAR, but no FAT had been performed and the lugs had not been shipped because Delfasco had not yet fully paid Trinity (R4, tab 53 at 1).

Approximately a week later, on 15 October 2013, Ms. Warner obtained financial data about Delfasco from the financial analysis firm of Dun & Bradstreet (D&B), which indicated a high level of financial instability for the company (R4, tab 55). On 21 October, Ms. Warner received input from the Army project office regarding the advisability of the proposed termination for default (R4, tab 56). This input covered such matters as the availability of other suppliers of the bomb lugs and the financial risks that would inure to other government contracts with Delfasco if the contract were terminated (id.). It also included a 2012 DCMA-conducted financial analysis of Delfasco which concluded that Delfasco was a "high risk" supplier due to its financial status (id.).

On 7 November 2013, Ms. Warner completed a nine-page memorandum for record justifying a termination of the contract for default (tr. 1/103-04; R4, tab 113). The purpose of this memorandum was to allow the termination decision to be "staffed" (tr. 1/103). In this memorandum, Ms. Warner explained the history of the contract and Delfasco's failure to make the 14 September 2013 delivery (R4, tab 113). She also evaluated Delfasco's response to the 20 September 2013 show cause letter and found its deflection of blame to Trinity to be an unpersuasive argument against finding default, since default is justified when the fault lies with the contractor or its subcontractor (id. at 4). This memorandum also addressed the D&B report and the 2012 DCMA report on Delfasco's finances and concluded that it was likely that Delfasco would continue to have difficulties paying its subcontractors (id. at 5-7).

On 14 November 2013, Ms. Warner issued an eight-page contracting officer's final decision (COFD) terminating the contract for default (see R4, tab 59). Three paragraphs of the COFD referenced the 2012 DCMA report on Delfasco's finances, the more recent D&B report, and Delfasco's difficulties paying Trinity and concluded

---

[8] Although there is no direct testimony on the matter, this may well have been in response to an email that Ms. Warner sent to Mr. Goldenberg the same day inquiring about the status of the inspection (see R4, tab 49 at 1).

that "Delfasco's problems paying its subcontractors would also likely continue" (*id.* at 4). Section II of the COFD setting forth the "Government Termination Decision" stated that "the cause of the default was NOT beyond the control of both Delfasco and Trinity the subcontractor, and the cause of the default was NOT without the fault or negligence of either Delfasco or Trinity" (*id.* at 5). It further elaborated that Delfasco was being terminated for its failure to deliver an "acceptable product in accordance with the delivery schedule" (*id.*). Nowhere in the COFD does Ms. Warner state that Delfasco was terminated due to any alleged financial difficulties (R4, tab 59). In her testimony, which we find credible[9], Ms. Warner stated that the reason for the termination was that "they didn't deliver" (tr. 1/131). This statement, that the basis for the termination was Delfasco's failure to deliver, was buttressed by Ms. Warner's 7 November 2013 internal memorandum in which she explained that "the specific failure" of Delfasco's that she was considering as a basis for the default was that "Delfasco failed to deliver 2,082 MS3314 lugs for CLIN 0003AQ that were scheduled to be delivered on 14 September 2013 in accordance with modification P00005 of contract W52P1J-12-C-0034" (R4, tab 113 at 2-3).

The termination of Delfasco's contract was formalized in Modification No. P00007 to the contract on 17 December 2013 (R4, tab 61).

Delfasco timely appealed the COFD to the Board on 10 February 2014.

*VIII. The Question of Delfasco's Financial Wherewithal*

At the hearing in this appeal, Delfasco argued that Ms. Warner's financial analysis rested upon faulty information that would have been cleared up if only she had bothered to inquire with Delfasco about it (app. br. at 17-18). As we found above, the decision to terminate the contract was premised upon Delfasco's failure to deliver on time, with aspects of Delfasco's finances only a collateral matter. Moreover, as we explain below, we find that, although Ms. Warner would have likely obtained additional information favorable to Delfasco had she spoken with Mr. Goldenberg about it, this favorable information would only marginally have changed the financial conclusions that she reached.

To be sure, the evidence is clear that, after receipt of Delfasco's 25 September 2013 response to the show cause letter, Ms. Warner had no communications with Delfasco, itself, about its payments to Trinity (tr. 1/89). Mr. Goldenberg testified that

---

[9] Although we do find Ms. Warner to have been a credible witness based upon our observation of her demeanor during her testimony and the general consistency and support of that testimony from other sources, the government's cause was not advanced by the portion of her testimony in which she simply read from the COFD, notwithstanding our explicitly directing her to do otherwise (*see* tr. 1/130).

9

there were a number of impressions that he would have corrected had he spoken with Ms. Warner (tr. 2/27-29).

First, Mr. Goldenberg stated, without contradiction, that Delfasco's account with Trinity was current and fully paid as of 18 October 2013 (tr. 2/26-27; *see also* R4, tab 117 at 3). Mr. Goldenberg also provided undisputed evidence that Delfasco was profitable in 2013 (app. br. at 18)[10]. Similarly, Mr. Goldenberg testified that Delfasco remained a viable company and had not filed for bankruptcy in 2013 or in any year thereafter (tr. 2/28). Mr. Goldenberg speculated, without basis, that the D&B report had mistakenly conflated Delfasco's current financial situation with its circumstances in 2010 when it declared bankruptcy (prior to Mr. Goldenberg's ownership) (tr. 2/28-29). Finally, with respect to the D&B report, Mr. Goldenberg argued that it was flawed because it reflected Delfasco's highest level of credit as being $40,000 notwithstanding the fact that it had "close to $17 million in contracts" (tr. 2/29).

As noted above, most of these additional "facts" would have been of little consequence. Ms. Warner was aware that Delfasco had made at least partial payments to Trinity about 30 September 2013 to allow it to provide the lugs (R4, tab 53 at 2). Whether Delfasco would be profitable for 2013 does not appear to be a component of the D&B analysis (*see* R4, tab 55 at 2-4), nor does it appear to be something that would have been certain (even to Delfasco) before the year was up. It almost goes without saying that Mr. Goldenberg could not have relayed to Ms. Warner, in 2013, what Delfasco's financial health would have been in 2013 through 2016, nor did the D&B report speak of the certainty of bankruptcy, just of its risk (*id.* at 3). Mr. Goldenberg's suggestion that D&B must have mistakenly tarred Delfasco for its previous bankruptcy is belied by the fact that, on its face, the D&B report notes that the company started in 2010 (*id.* at 2), which is the date that Mr. Goldenberg testified he took it over out of bankruptcy (tr. 2/6). The company's previous incarnation was in bankruptcy in 2009 (R4, tab 55 at 2). Finally, we do not see the contradiction between Mr. Goldenberg's assertion that Delfasco had millions of dollars in government contracts and D&B's noting, under "credit capacity," that Delfasco's "highest credit" was $40,000 (*id.* at 3). The value of Delfasco's contracts is not the same thing as the credit lines with other companies that Delfasco used or obtained during the reporting period.

---

[10] The detailed testimony on this and the written evidence supporting it were subject to protective order, but we openly reference it here since the government does not dispute the general notion that Delfasco was profitable; the details of how profitable Delfasco was are of no importance to this dispute; and Delfasco's un-protected opening brief stated that Delfasco was profitable.

Accordingly, we find no evidence that Mr. Goldenberg would have corrected any flaws in the D&B report if he had been asked because Delfasco has not identified any aspects of the report that are contradicted by evidence in existence at the time the report issued. The remainder of the additional facts relayed by Mr. Goldenberg (i.e., Delfasco's profitability in 2013 and its payment of invoices to Trinity in October 2013) are, in our factual judgment, of small import compared to the larger financial picture presented by the 2013 D&B report, the 2012 DCMA report, and the continued experience of Trinity's failing to ship lugs to Delfasco as a result of lack of payment.

*IX. Work Done on the Contract Subsequent to the Show Cause Letter*

At trial, Delfasco presented evidence in support of the argument that DCMA had encouraged it to perform upon the contract even as it was preparing to terminate it for default, thus waiving its timely delivery rights (*see* app. br. at 9-13, 31). The evidence before us does not support a conclusion that the government communicated to Delfasco its forbearance.

The starting place for this factual analysis is the 20 September 2013 show cause letter sent to Delfasco. In this letter, Ms. Warner expressly stated:

> Any assistance given to you on this contract or any acceptance by the Government of delinquent goods or services will be solely for the purpose of mitigating damages, and is [sic] not the intention of the Government to condone any delinquency or to waive any rights the Government has under the contract.

(R4, tab 43 at 1) In its 25 September 2013 response to the show cause letter, Delfasco stated that:

> [I]t is Delfasco's sincerest desire to continue with the current delivery schedule stated in modification P00005, with the understanding that the September 14, 2013 shipment will be delivered within 10-14 days of receipt of Trinity's MS3314 forgings.

(R4, tab 45 at 2) There is no evidence or allegation that the government ever accepted this proposal. When Ms. Warner next had contact with Mr. Goldenberg, on 7 October 2013, she was clear that she was not "at liberty" to discuss the contract, even as she inquired about the delivery of the MS3314 lugs (R4, tab 53 at 1). We note further that she prefaced her inquiry to Mr. Goldenberg by stating "IF he chose to proceed" (*id.* (emphasis in original)). Given the fact that, in the same internal correspondence

11

that reported this discussion with Mr. Goldenberg, Ms. Walker referenced the potential termination for default and that those receiving the email should "be mindful of encouraging performance" (*id.*), we find it more likely than not that Ms. Walker was careful with her words and did not say anything to contradict the message in the show cause letter that continued performance was for mitigation purposes and that the government was not waiving its rights to timely performance.

Thus, we do not perceive Ms. Warner's email inquiry to Mr. Goldenberg about coming inspections, sent the same day (R4, tab 49 at 1), to constitute any different signal regarding waiver from the government.

The next day, 8 October 2013, the DCMA QAR inspected the remaining MS3314 lug forgings at Trinity and approved them (R4, tab 115 at 3). Sometime between the 23rd and 25th of October 2013, DCMA also inspected some MK3 lugs provided by Trinity (*id.*; tr. 2/80). We find that the government's providing QA inspections at Trinity's request a day after Ms. Warner's discussion with Mr. Goldenberg and then slightly more than two weeks later is congruent with the message conveyed in Ms. Warner's telephone conversation with Mr. Goldenberg on 7 October, which was that, consistent with the show cause letter, there were no guarantees that this performance would be for any reason beyond mitigation.

Although the government was not involved in any additional inspections prior to Ms. Warner's letter to Delfasco terminating the contract for default, Delfasco took steps to complete the lugs and prepare them for delivery to the government. On 22 or 23 October, after having paid Trinity the outstanding balance for them (tr. 2/15-16), Delfasco took delivery of the 2,738 MS3314 lug forgings it would need to complete its delinquent deliveries (R4, tabs 108, 118). Mr. Goldenberg also testified that Delfasco received a number of MK3 lug forgings on 18 October as well (tr. 2/18), although that appears to be at variance with the evidence that the MK3 forgings at Trinity were inspected, at Trinity, between 23 and 25 October (tr. 2/80). In any event, the discrepancy in dates for the MK3 forgings is not of any import: it is enough for us to find that they were provided by Trinity to Delfasco at some point in mid to late October 2013.

Upon receipt of the MS3314 lug forgings, Delfasco prepared a subset of them (perhaps 50 to 200 – the evidence presented by Delfasco was unclear) for FAT, while leaving the remainder unfinished until completion of the FAT (tr. 2/19-24). These were prepared for a FAT, but there is no indication in the record that a FAT was ever performed upon them, and the contract was terminated prior to the remainder of the unfinished lug forgings being worked on by Delfasco (tr. 2/19).

## DECISION

As Delfasco freely admits, it failed to deliver the lugs that were contractually due on 14 September 2013 (app. br. at 7). Delfasco further concedes that "there were no factors beyond Delfasco's control that excused the failure to deliver on September 14" (*id.* at 36). Nevertheless, Delfasco argues that the government was wrong to terminate its contract for default for two primary sets of reasons: first, Delfasco asserts that Ms. Warner's consideration of its finances was problematic because the show cause letter did not advise Delfasco of the government's concerns regarding its finances (*id.* at 18) and because the facts were so at odds with what she considered them to be that it was an abuse of discretion on her part (app. reply br. at 5-13); second, Delfasco posits that the government waived its right to terminate the contract, first by the passage of time after the show cause letter, during which period it continued to perform (app. br. at 31); second, by deciding to hold a FAT, which allegedly communicated a waiver of the schedule (app. reply br. at 15-20). Neither the arguments regarding finances nor the arguments regarding waiver carry the day.

### I. The Standard of Review

As Delfasco correctly notes (app. br. at 31), "a default-termination is a drastic sanction which should be imposed (or sustained) only for good grounds and on solid evidence." *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1987) (quoting *J.D. Hedin Constr. Co. v. United States*, 408 F.2d 424, 431 (Ct. Cl. 1969)). Though this is an appeal brought by Delfasco, because a termination for default is essentially a government claim, the government bears the burden of proving, "by a preponderance of the evidence, that a termination for default was justified." *DayDanyon Corp.*, ASBCA No. 57681, 15-1 BCA ¶ 36,073 at 176,151, *aff'd*, 600 F. App'x 739 (Fed. Cir. 2015); *Keystone Capital Services*, ASBCA No. 56565, 09-1 BCA ¶ 34,130 at 168,753 (citing *Lisbon Contractors*, 828 F.2d at 765). Delfasco's waiver argument, however, is an affirmative defense, for which it bears the burden of proof. *See DayDanyon* 15-1 BCA ¶ 36,073 at 176,152; *see also Long Island Savings Bank, FSB v. United States*, 503 F.3d 1234, 1252 (Fed. Cir. 2007). Likewise, Delfasco's argument that the termination of the contract was an abuse of discretion is also one for which it bears the burden of proof. *Darwin Constr. Co. v. United States*, 811 F.2d 593, 598 (Fed. Cir. 1987).

### II. The Government's Decision to Terminate the Contract was Justified

As we found above, the government terminated the contract for failure to deliver the lugs due on 14 September 2013 on schedule (or, indeed, ever). Delfasco does not dispute the fact that it failed to comply with the contract's delivery schedule. This failure to make timely delivery, by law, "establishes a prima facie case of default."

13

*DayDanyon*, 15-1 BCA ¶ 36,073 at 176,151 (citing *Lisbon Contractors*, 828 F.2d at 764-65); *see also* FAR 52.249-8(a)(1)(i). The next analytic step is to determine whether Delfasco's delay was excusable. *DayDanyon*, 15-1 BCA ¶ 36,073 at 176,151 (citing *DCX, Inc. v. Perry*, 79 F.3d 132, 134 (Fed. Cir. 1996)). Delfasco's response to the show cause letter was to blame its subcontractor for the delays, without apparently recognizing that the default clause incorporated into the contract, FAR 52.249-8 (in particular FAR 52.249-8(d)), does not excuse performance for failure that is the fault of the subcontractor. By the time of the post-trial briefing, however, Delfasco knew better, and conceded that "there were no factors beyond Delfasco's control that excused the failure to deliver on September 14" (app. br. at 36).

Accordingly, we are satisfied that the government had an adequate legal basis for terminating the contract and that Delfasco provided no reason to excuse its default, giving us solid evidence and good grounds to sustain it.

### III. The Government's Consideration of Delfasco's Finances Did Not Invalidate the Termination

Delfasco makes one argument regarding Ms. Warner's consideration of its finances in its opening brief and then adds an entirely new argument in its reply brief. Delfasco's exclusive argument in its opening brief is that the termination should be set aside because Ms. Warner failed to advise Delfasco of her concerns regarding its finances in the show cause letter which, Delfasco alleges, is a prerequisite for their consideration (*see* app. br. at 18-31). Delfasco's reply brief advances the wholly new argument that Ms. Warner's consideration of supposedly inaccurate financial information constituted an abuse of her discretion, thus invalidating her decision (app. reply br. at 5-13). Upon the facts of this case, neither argument is persuasive.

We turn first to Delfasco's argument regarding the supposedly defective notice in the show cause letter. This argument is disposed of by our finding that the grounds for default were those in the letter; Delfasco's failure to deliver the lugs due on 14 September 2013. Delfasco cannot reasonably contend that the notice was defective when the notice explicitly informed Delfasco of the potential basis for the termination. Indeed, when the legal basis for default is failure to deliver by the time required by the contract (i.e., the basis set forth in FAR 52.249-8(a)(1)(i)), as it is here, the contractor is entitled to no cure notice, whatsoever. *See* FAR 49.402-3(c); *Lafayette Coal Co.*, ASBCA No. 32174, 89-3 BCA ¶ 21,963 at 110,482. If no cure notice is required, it follows that a termination cannot be overturned because the cure notice that issued was incomplete.

To be sure, Delfasco spends much space in its brief and in the case it presented to the Board arguing that the real basis for the government's decision was its supposedly misplaced concerns about Delfasco's financial well-being (*see, e.g.,*

app. br. at 20-26), but we do not consider that portion of the government's memorandum to reflect the legal justification for the termination, but, rather, the government's internal deliberation concerning whether the termination would have been in its self-interest. We have reviewed each of the numerous cases cited in Delfasco's brief and find that none of them requires that the show cause letter advise a defaulting contractor of all the internal considerations that the government may use in deciding whether to exercise its discretion to default the contract, once it determines default to be legally justified. That deliberation may be subject to review for purposes of abuse of discretion, as we discuss immediately below, but it is intended for the benefit of the government, not the contractor. *Cf. DCX*, 79 F.3d at 135 (FAR provision requiring CO to consider certain factors regarding the interests of the government prior to termination of contract "does not confer rights on a defaulting contractor.").

We now address Delfasco's argument, effectively raised for the first time in its reply brief that Ms. Warner's decision was an abuse of discretion because it relied upon incorrect facts about its financial well-being. As will be seen, we reject the argument because the law does not impose upon the CO the duty to be perfect, just reasonable, and Delfasco has not met its burden of proof to demonstrate that Ms. Warner's view of its finances was materially wrong. Moreover, we would uphold the termination decision even if it were based upon a completely erroneous understanding of Delfasco's finances because Delfasco gave the government no reason to believe that its timely delivery problems would be remedied in the future.

Terminations for default are subject to review for abuse of discretion. *McDonnell Douglas Corp. v. United States*, 182 F.3d 1319, 1321 (Fed. Cir. 1999); *L&H Constr. Co.*, ASBCA No. 43833, 97-1 BCA ¶ 28,766 at 143,555-56. As the Federal Circuit explained in *McDonnell Douglas*, "Properly understood...*Schlesinger* and its progeny merely stand for the proposition that a termination for default that is unrelated to contract performance is arbitrary and capricious, and thus an abuse of the contracting officer's discretion." 182 F.3d at 1326. The *McDonnell Douglas* court further explained that the factors to be considered in determining whether an action as an abuse of discretion included:

> (1) [E]vidence of subjective bad faith on the part of the government official, (2) whether there is a reasonable, contract-related basis for the official's decision, (3) the amount of discretion given the official, and (4) whether the official violated an applicable statute or regulation.

*Id.* (citing *United States Fidelity & Guaranty Co. v. United States*, 676 F.2d 622, 630 (Ct. Cl. 1982)).

15

We have held in past cases that terminations for default constitute an abuse of discretion when they are based upon "materially erroneous information." *L&H Constr.*, 97-1 BCA ¶ 28,766 at 143,556; *see also Walsky Constr. Co.*, ASBCA No. 41541, 94-2 BCA ¶ 26,698 at 132,785 (government owes contractor an assessment of all relevant circumstances when terminating for default); *The Ryan Co.*, ASBCA No. 48151, 00-2 BCA ¶ 31,094 at 153,544; *Ryste & Ricas, Inc.*, ASBCA No. 51841, 02-2 BCA ¶ 31,883 at 157,518. Importantly, however, in all of these cases the flaws in the terminating contracting officer's (TCO's) exercise of discretion were extreme. In *L&H*, the TCO was fed incomplete and inaccurate information by engineering employees in the field who exaggerated the contractor's culpability for the performance delay that was the cause of the termination, covered up the government's responsibility for the delay, and presented "calculations [that] were not credible" regarding the length of time it would take to complete the contract. 97-1 BCA ¶ 28,766 at 143,553-56. In *Walsky*, the government's director of contracting (who influenced the TCO's decision to terminate the contract) had animus towards the contractor and directed his staff to monitor the contractor more than usual and to terminate the contract "if the smallest thing goes wrong." 94-2 BCA ¶ 26,698 at 132,784-85. In *Ryan*, we were again presented with a case in which base contracting personnel withheld information from the TCO and, in fact, provided her false information and actively misled her "with the intended purpose of getting Ryan's contract terminated." 00-2 BCA ¶ 31,094 at 153,544. And, finally, in *Ryste & Ricas*, although there was none of the apparent misconduct of the three other cases, the TCO terminated the contract for failure to complete it in a timely manner, but did not give any consideration to the evidence that the contract could be substantially completed within the time that would have been permitted by extensions that may have been reasonably appropriate for four contract modifications issued by the same CO. 02-2 BCA ¶ 31,883 at 157,518.

None of our cases cited by Delfasco, nor any other binding precedent, involve the case of government officials acting reasonably and in good faith, but mistakenly. Indeed, they all tend to show "subjective bad faith" on the part of government officials making or influencing the termination decision or, at the least, the lack of a "reasonable, contract-related basis" for the decision – in other words, they fall within the factors defining abuse of discretion set forth by the Federal Circuit in *United States Fidelity & Guaranty* as cited by that court in *McDonnell Douglas*, above. *See* 182 F.3d at 1326. With this in mind, we conclude that our prohibition against consideration of "materially erroneous information" by the TCO does not mean that the TCO must get everything right to avoid abusing her discretion, just that she act reasonably with the facts before her and that those placing the facts before the TCO not be acting in bad faith.

With the law properly understood, we find that Delfasco has not met its burden of proving that Ms. Warner abused her discretion. First, we note that there were no

16

allegations, much less any evidence, that Ms. Warner or any government employees acted in bad faith. To the contrary, the history of the contract demonstrated efforts by the government to extend the time for its performance once Delfasco demonstrated its inability to meet its deadlines in the summer of 2013. Next, the undisputed evidence was that Ms. Warner was motivated by the contract-based issue of Delfasco's failure to deliver. Finally, Delfasco has not met its burden of proving that Ms. Warner significantly erred in her consideration of the facts before her. In assessing the likelihood of continued problems in performance by Delfasco, Ms. Warner evaluated its track record of failing to pay Trinity, DCMA's 2012 evaluation of Delfasco, and the more recent third-party evaluation of Delfasco's financial well-being by D&B, a well-known and trusted financial resource. We find these efforts to have been reasonable. *See Precision Dynamics, Inc.*, ASBCA No. 42955, 97-1 BCA ¶ 28,846 at 143,894 (CO's consideration of relevant factors, including contractor's excuses for nonperformance met requirements for valid exercise of discretion).

Delfasco argues, albeit implicitly, that the government should have been required to approach it with its concerns about its finances so that they might have been allayed (app. reply br. at 12). We disagree. Once the government has given the contractor the right to be heard on whether there is a legal basis for terminating the contract (e.g., whether the contractor is, in fact, in default), there is no further right for the contractor to participate in the internal government decision about how it should exercise its considerable discretion. Moreover, our factual finding above, that Delfasco had not demonstrated the D&B report to be materially incorrect, indicates that, even if Ms. Warner had asked for Delfasco's input on this matter, the information before her may have been different, but not materially so. Thus, Delfasco has not met its burden of proof for its claim that Ms. Warner's decision to terminate it was an abuse of discretion.

Finally, with respect to abuse of discretion, we note that the law permits a termination for default to be sustained even upon grounds not considered by the TCO. *See Empire Energy Mgmt. Sys., Inc. v. Roche*, 362 F.3d 1343, 1357 (citing multiple cases); *AEON Group, LLC*, ASBCA Nos. 56142, 56251, 14-1 BCA ¶ 35,692 at 174,752. We thus "consider the totality of the circumstances existing at the time of the termination [to determine] whether the termination...for default was justified." *AEON*, 14-1 BCA ¶ 35,692 at 174,752.

Here, regardless of the particular financial reports considered by Ms. Warner, Delfasco had a history of failing to provide the lugs when required by the contract, and the government had already extended the delivery date once before (indeed, Delfasco made even this act of grace by the CO difficult by constantly delaying presenting a delay proposal to the government despite numerous requests for it). There is ample evidence that a significant portion of the problem with timeliness came from Delfasco's relationship with Trinity, which it did not pay in a timely fashion, and there

17

was evidence of quality problems caused by the break in time for manufacturing. On the totality of these circumstances – all of them contract-based – a reasonable TCO, who had still not yet received the lugs almost two months after they were due, would not be abusing her discretion when deciding to terminate the contract. Thus, we could sustain the termination on lesser financial grounds than those considered by Ms. Warner.

## IV. The Government did Not Waive Timely Performance of the Contract

In certain circumstances, the government may waive its right to terminate a contract for untimely contract performance. *See, e.g., De Vito v. United States*, 413 F.2d 1147, 1153 (Ct. Cl. 1969). This is what Delfasco asserts happened here, with the company being allegedly strung along by DCMA as it incurred additional costs in its attempts to perform subsequent to submitting its 25 September 2013 response to the government's show cause letter (*see* app. br. at 31, 36-37). As will be seen, although a speedier termination decision by the government would have made our decision easier, we conclude that Delfasco has not met its burden of proof in demonstrating waiver.

In *DeVito*, the Court of Claims first articulated the two elements for waiver in a case involving termination for default due to late delivery. They are:

> (1) [F]ailure to terminate within a reasonable time after the default under circumstances indicating forbearance, and (2) reliance by the contractor on the failure to terminate and continued performance by him under the contract with the Government's knowledge and implied or express consent.

*DeVito*, 413 F.2d at 1154. Recognizing that application of the law of waiver is particularly fact intensive, *see Prestex, Inc.*, ASBCA No. 21284, 81-2 BCA ¶ 15,397 at 76,279, we will discuss each element separately, along with its application to the facts here.

With respect to the first element, the government's indication of forbearance, *DeVito* must be considered in context. As the Court of Claims subsequently explained in *Pelliccia v. United States*, 525 F.2d 1035 (Ct. Cl. 1975),[11] the *DeVito* court was "heavily influenced" by the fact there was no show cause letter in the case, which had left the contractor without "any inkling that the contracting officer was thinking in

---

[11] For the sake of completeness, we note that *Pelliccia* was a *per curiam* decision that adopted and confirmed the opinion of the trial judge. *Pelliccia*, 525 F.2d at 1037. It is the opinion of the trial judge, reproduced in whole by the court that is cited to herein.

18

terms of a termination for default." *Pelliccia*, 525 F.2d at 1043. That is not to say that a show cause letter, alone, insulates the government from the waiver defense. As we explained in *Prestex*, 81-2 BCA ¶ 15,397 at 76,279, the government's actions after receipt of the response to a show cause letter may well be read to indicate forbearance. Still, a show cause letter is a significant factual event, as directly indicated by the *DeVito* and *Pelliccia* courts, and it is clear that we should not treat cases with show cause letters identically to those without such a notice.

One of the most thoughtful recent decisions regarding waiver from the Board is the 2015 case of *DayDanyon* which, unfortunately, was not discussed in appellant's brief and was only marginally referenced for these purposes by the government's reply (*see* gov't reply br. at 7 n.4). In *DayDanyon*, we analyzed the considerable body of our law applying the waiver doctrine and differentiated between "affirmative" and "nonaffirmative" government actions in deciding whether there was government forbearance. *DayDanyon*, 15-1 BCA ¶ 36,073 at 176,153 (citing numerous cases). As a general rule, nonaffirmative government action is less likely to constitute government waiver than affirmative actions. *Id.* Important to the facts presented here, merely attending QA tests, does not constitute an affirmative government action. *Id.* (citing *Precision Dynamics*, 97-1 BCA ¶ 28,846 at 143,893-94). Indeed, in *Pelliccia*, the Court of Claims upheld our decision that had determined the inspection of parts by government QA personnel during the show cause period did not constitute an inducement to perform. *Pelliccia*, 525 F.2d at 1044. Instead, the government's cooperation on quality inspections during this period reflected its desire to avoid being a cause of delay or to hinder contract performance. *Id.*

In its efforts to show that the government waited too long to terminate the contract, Delfasco relies heavily on our decision on reconsideration in *Beta Engineering, Inc.*, ASBCA Nos. 53570, 53571, 02-2 BCA ¶ 31,970 at 157,912 (*see* app. br. at 39-40), a decision which bears some superficial resemblance to the facts here with a significant difference; as is evident in the original decision, there was no show cause letter in *Beta Engineering*. *See Beta Engineering*, 02-2 BCA ¶ 31,879 at 157,495.[12] Thus, it is a materially different case than is presented here.

Upon the facts before us, we conclude that Delfasco has not met its burden to prove that the government's actions indicated forbearance. The show cause letter plainly placed Delfasco on notice that any continued assistance from the government or continued performance would only be for the purposes of mitigating damages, and the government acted consistently with this message in the only communication that Ms. Warner had with Delfasco, on 7 October 2013, when she underscored that she was not at liberty to discuss the contract and that questions about future performance were

---

[12] Of course, as we discussed above, the existence of a show cause letter, alone, is not dispositive, but it is surely significant.

only "IF" [emphasis in original] Delfasco chose to continue. As we found above in our findings of fact, a reasonable contractor would not construe the communication as manifesting the government's forbearance. Indeed a very good case may be made that Ms. Warner's statement, approximately two weeks after receipt of the response to the show cause letter, that she was not "at liberty" to discuss it, was a clear warning that she was inclined to take an action for which she needed higher approval, i.e., default termination. The two sets of QA inspections that followed in the subsequent two weeks, as discussed above, were consistent with the government's acting to permit mitigation by Delfasco and avoid interference with performance prior to termination. *See Precision Dynamics*, 97-1 BCA ¶ 28,846 at 143,893-94. Thus, like the Court of Claims found in *Pelliccia*, the facts and circumstances presented by Delfasco here do not support the conclusion that it "could have failed to recognize that a default termination was very much in contemplation." *Pelliccia*, 525 F.2d at 1043. Accordingly, we find that Delfasco has not met the requirements of the first prong of the *DeVito* test, and there was no waiver.

We could end our waiver analysis here, but for completeness, will address the second prong of the *DeVito* test, continued performance under the contract with the government's knowledge and implied consent. *See DeVito*, 413 F.2d at 990-91. We again turn to the analysis by the Court of Claims in *Pelliccia* and our analysis in *DayDanyon*. To meet the second prong of the *DeVito* test, the contractor's actions must have been "tangible" and more than comparatively "insubstantial." *Pelliccia*, 525 F.2d at 1043; *see also DayDanyon*, 15-1 BCA ¶ 36,073 at 176,154. In *DayDanyon*, we made clear that the contractor must have incurred non-trivial performance costs in reliance upon the government's encouragement in order for this prong to be met. 15-1 BCA ¶ 36,073 at 176,154.

Delfasco argues that it incurred costs by making multiple payments to Trinity subsequent to the show cause letter and also began machining a limited number of lugs in anticipation of a FAT (app. br. at 38-39). Delfasco has not convinced us that these costs meet the requirements of the second prong of the *DeVito* test. With respect to the payments to Trinity, the money paid by Delfasco appears to have been owed to Trinity in any event, and Delfasco presented no evidence that it incurred *new* obligations to its subcontractor in the time between its failure to deliver and the government's default – certainly not between the time of the 7 October 2013 discussion with Ms. Warner and the 14 November 2013 default. If the obligations were not new, they certainly cannot be said to have been incurred in reliance upon the government's failure to terminate. The cost of machining and plating the small number of lugs that Delfasco prepared for a FAT has not been disclosed by Delfasco, but they have not been demonstrated by Delfasco to have been substantial. Furthermore, Delfasco has presented no evidence that the government was aware of these machining and plating costs. Thus, we hold that Delfasco has not met its burden of proof with respect to the second prong of the *DeVito* test.

Finally, separate and apart from its other waiver arguments, Delfasco contends that the FAT discussions in early September 2013 acted to waive the requirement for timely performance (app. br. at 42-43). This is simply not borne out by the facts.

The most damning piece of evidence that Delfasco was not gulled into nonperformance by the possibility of a renewed FAT is its 25 September 2013 response to the show cause letter. Nowhere in that response does Delfasco refer to the potential FAT. If the potential for an FAT indicated to Delfasco that time was no longer of the essence, we would expect this argument to be front and center in its response to the show cause letter.

Moreover, the evidence indicates that, until Delfasco made the internal decision in late October 2013 to prepare only enough lugs for a FAT, it had never accepted that a FAT was, indeed, required. Mr. Watkins's 4 September 2013 email to Ms. Oakes argued, from Delfasco's point of view, that no FAT was necessary, and his 11 September email to Mr. Goldenberg (forwarded by Mr. Goldenberg to the government) only agreed that notification to the government was appropriate; not that a FAT would actually be necessary.[13] Given that this was just a few short days before the 14 September delivery was due, Delfasco cannot seriously contend that it would have met the delivery schedule but for these discussions.

We finally note that Delfasco produced no contemporaneous documentation indicating that the potential for a FAT was a consideration that prevented it from timely performance, nor did Delfasco produce any documentation that the government was willing to extend the contract performance time to allow for a potential FAT.

All of these facts also apply to Delfasco's eleventh-hour argument, presented only in its reply brief, that the lack of government certitude regarding the FAT was a breach of the contractual covenant of good faith and fair dealing (*see* app. reply br. at 17-19). We reject this argument because Delfasco has produced no evidence that the supposed government inaction hurt it. Moreover, the ambiguity with regard to whether the FAT would be required was primarily the fault of Delfasco (which, internally, recognized that it had failed to notify the government of the conditions requiring a FAT), not the government.

---

[13] As discussed in our findings of fact above, even as late as 21 October 2013, Mr. Watkins was uncertain as to whether a FAT would actually be required by the government, given that Delfasco had never asked, and Delfasco had failed (from his point of view) to inform the government of the potential need for the FAT.

## CONCLUSION

For the reasons stated herein, we find that the government's decision to terminate the contract here was justified by good grounds and rested upon solid evidence. It reflected no abuse of discretion and the government's delays in termination were not so long or misleading as to waive timely performance. The appeal is denied.

Dated: 14 February 2017

J. REID PROUTY
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 59153, Appeal of Delfasco LLC, rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

22